Kenneth GRANVIEL, Appellant,

v.

The STATE of Texas, Appellee.

No. 52732.

Court of Criminal Appeals of Texas.

Nov. 10, 1976.
Certiorari Denied May 23, 1977.
See 97 S.Ct. 2642.

**110**

Charles Dickens and Frank W. Sullivan, III, Fort Worth, for appellant.

Tim C. Curry, Dist. Atty., and Marvin Collins, Asst. Dist. Atty., Fort Worth, Jim D. Vollers, State's Atty., and David S. McAngus, Asst. State's Atty., Austin, for the State.

## OPINION

GUPTON, Judge.

The offense is capital murder under V.T. C.A., Penal Code, Sec. 19.03(a)(2); the punishment, death.

Appellant was charged with the killing of Natasha McClendon while in the course of committing rape on another person. The sufficiency of the evidence to support the jury's verdict of guilty is not challenged. The record reflects that on October 7, 1974, appellant left work at 8:00 p. m. and drove to his apartment, where he watched the first half of a televised football game with his roommate. Appellant then decided to "go riding" because he wasn't enjoying the game. He drove through his apartment complex to the McClendon apartment, which was located in the same complex. While driving around the block, appellant "got this urge to have sex" with Laura McClendon, although they had never had intercourse previously. Appellant testified he had known the McClendon girls[1] for approximately three years. He parked his car in front of the McClendon apartment and remained seated in it for several minutes. Through the open window of the apartment, he was able to see Laura inside.

At approximately 10 p. m. appellant walked up to the apartment and found the

---

1. Laura and Martha McClendon were sisters. Linda McClendon was a cousin.

front door open. Appellant knocked and Laura invited him in. After some conversation, appellant asked for a drink of water. At that point, he was only interested in finishing the water and leaving. However, he returned the glass to the kitchen where Laura was cleaning the stove and her small son [Steven] was playing. Appellant then walked up behind Laura and placed a knife, which he had brought with him, to her throat. Appellant assumed Laura thought he was kidding. He told her to place her arms around him and smile so that Steven wouldn't be nervous.

Appellant, Laura and Steven walked toward Laura's bedroom with appellant locking the front door and closing the curtains on the way. Laura then told appellant that he "didn't have to take it" at which time he put the knife in his back pocket. Appellant had Laura tie her son with a telephone cord appellant had ripped from the wall when Steven started crying. Next appellant tore a bedsheet in strips and bound and gagged both Steven and Laura. Appellant then laid Laura and Steven "face down" on the bed, at which time Martha and her two year old daughter Natasha entered the apartment with her cousin Linda.

After calling, "Where is Laura?" Martha entered the bathroom. Natasha entered Laura's bedroom, saw appellant and ran to join her mother in the bathroom. At that time appellant covered Laura and Steven with a bedspread and Linda entered the room. Appellant showed her the knife and instructed her to lie down beside Laura on the bed.

Meanwhile, Martha left the bathroom and went into the livingroom. Appellant walked up behind her and grabbed her, throwing her on her head. Appellant then took Martha to her bedroom and bound her. He returned her to Laura's bedroom where he bound and gagged the remaining members of the McClendon family. Appellant then left the apartment and moved his car.

Upon reentering the apartment, appellant took Laura to the back [Martha's] bedroom and began removing her clothes. At this point he cut Laura on the inner thigh

with his knife. Steven began crying and appellant placed him on a trunk in a closet of Laura's room. Laura told appellant that Steven needed his asthma medication which appellant then gave him. Appellant raped Laura, after which they sat and talked for about an hour.

Steven began crying so appellant stabbed him several times, thereby breaking his knife. While appellant was stabbing Steven, someone knocked on the front door. Appellant went to the kitchen for another knife and threw the handle of the broken knife into the trash can and the blade into the sink.

Following a second conversation with Laura, appellant brought Martha to the back bedroom, where he cut her on both arms and raped her. Appellant returned to Laura's bedroom for Linda; she wasn't breathing at that time. Appellant then stabbed Linda several times. Natasha began "hollering" so appellant stabbed her several times as she lay on the floor between the bed and the dresser. He then "threw her on the bed" and stabbed her again.

Appellant returned to the back bedroom and talked with Laura before he began stabbing Martha and then Laura. Appellant then went through the women's purses and removed their money. He left the apartment, leaving the second knife in the back bedroom. Laura, Linda, Martha, Natasha and Steven McClendon died as the result of these injuries.

Approximately four months later [February 8, 1975] appellant spent the day playing cards with friends. Not long after he returned to his apartment, Betty Williams knocked on his front door and asked to use the telephone. Afterwards, she asked appellant if he had smoked someone else's cigarettes that afternoon by mistake. Appellant threw her half a pack, but as she opened the door and started to leave he "had an urge". Appellant suggested she take a full pack and told her it was in the bedroom. As Betty looked for the cigarettes, appellant walked up behind her, grabbed her, and "turned her upside down

on her head." She appeared dazed and appellant began removing her clothes.

At that point, Vera Hill, the woman with whom appellant lived, began to unlock the apartment door. Appellant took a knife from the kitchen and stabbed Vera until she fell. He returned to the bedroom and was attempting to rape Betty when he heard a knock on the door. He choked Betty to quiet her and then told his friend at the door to return later, because he [appellant] and Vera were fighting. Appellant moved Vera's body to the kitchen so it could not be visible from the front door. Another knock on the front door went unanswered and appellant returned to the bedroom and raped Betty. In order to keep Betty quiet, appellant "tried to wrap her chin and neck around the bed post." He then stabbed her and struck her head with a hammer. Vera Hill and Betty Williams both died from the injuries they received.

Appellant left his apartment after attempting to eat a sandwich and drove in his car for a while, ending at Wanda Hanson's apartment. Wanda was not home, so appellant asked her mother, Lizzie Phillips, if he could use her phone. Mrs. Phillips allowed appellant into the apartment, following which he bound Mrs. Phillips and her two grandchildren. Appellant placed the small boy in a closet and was in the process of raping Mrs. Phillips when Wanda's sister knocked on the front door. Appellant found a gun under Mrs. Phillips' mattress and held it to the head of the entering woman. He directed her to the bathroom and allowed her to keep her son and daughter with her. Appellant also brought the baby its bottle.

Appellant took Mrs. Phillips to the living-room and raped her. He then went to the door and motioned for the daughter's husband to come inside. The man was led to a closet and Mrs. Phillips was again taken to her bedroom and raped.

In the course of the third rape of Mrs. Phillips, Wanda and her boyfriend entered the apartment. Appellant announced that he and Wanda were going for a ride and ordered her family not to call the police for 12 hours because by that time he would have turned himself in.

After going to his apartment, appellant and Wanda drove to Rev. R. L. Spearman's home and the three of them proceeded to the police station where appellant gave statements concerning both incidents.

■ In three grounds of error appellant asserts (1) V.T.C.A., Penal Code, Sec. 19.03 is unconstitutional because the punishment of death is not the least restrictive means to protect any compelling state interest, (2) the death penalty sanctions the arbitrary imposition of death as punishment in violation of the Eighth and Fourteenth Amendments to the U. S. Constitution, and (3) the death penalty constitutes cruel and unusual punishment. These contentions have been answered adversely to appellant in *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929, and in *Jurek v. State*, Tex.Cr. App., 522 S.W.2d 934. See also *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 and *Proffitt v. Florida*, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913. Grounds of error one, fifteen and sixteen are overruled.

■ In his second ground of error appellant alleges the trial court erred in excluding five venirepersons for cause in violation of the standards of *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).

Donald L. Harrison stated that, "No, I could not" ever vote to inflict the death penalty and that this was a definite prejudice or feeling he would not change. Upon the State's challenge for cause, appellant's counsel stated, "We do not have any questions", in response to the court's inquiry if he had any objections to the exclusion of this person. The record shows that no questions were asked whatsoever. No error is shown. *Boulware v. State*, Tex.Cr.App., 542 S.W.2d 677 (1976).

Homer L. Lipscomb stated:
"Q [PROSECUTOR] You don't think you could imagine any sort of case in which you feel the death penalty to be justified, then?

A No."

He stated he didn't believe in that form of punishment, and that no matter how terrible the crime might be, he wouldn't want that on his mind and that this was a firm conviction that he wouldn't let anyone talk him out of. Upon State's challenge for cause, the appellant's counsel made no objection, nor did he question this person. No error is shown. *Boulware, supra.*

Inez Wallace advised the trial judge before any questions were asked her that she was suffering with hypertension, her feet were swollen, she had physical problems and she felt she would be incapacitated for jury service. The trial judge ruled that she be questioned and "see how it goes". She stated she believed in the Bible and that no one should kill anyone. She first stated she could give consideration to the death penalty, but then stated she didn't think she could personally make decisions which might result in the death of another human being. Thereafter, she stated she had a deep-seated feeling that would prevent her from taking part in rendering the death penalty and that she just didn't believe in it and this was a firm conviction nobody could talk her out of. The State then challenged her for cause. Then the following questions were propounded by the trial court:

"Q THE COURT: Mrs. Wallace, I am sure you do feel deep about this. Its brought tears to your eyes; is that right?
A Yes.
Q THE COURT: All right. I know it's not an easy thing for you to go through here. The challenge for cause is sustained. Do you understand, Mrs. Wallace, nobody is unhappy with you. You have been excused, Mrs. Wallace. (Whereupon Juror Number thirty-six excused.)"

The trial court then excused this person. The appellant's counsel made no objection to her exclusion from the panel, nor did he question this person. No error is shown. *Boulware, supra.*

Mrs. Ray F. Cox stated that she could not consider the death penalty under any facts or circumstances. The State then chal-

lenged her for cause. The court sustained the challenge and then excused her from the jury panel. Appellant's counsel made no objection to her exclusion, nor did he question her. No error is shown. *Boulware, supra.*

Mrs. Mattie D. Vernon stated at first that she did not know whether or not she could ever vote to inflict the death penalty. She then stated, "I don't guess I could because I mean a life is a life." She then stated again that she did not know. Thereafter she stated she would have religious or conscientious scruples against the death penalty, and again stated that she didn't know. Finally, she responded as follows:

"Q [PROSECUTOR] Well, as I say, Mrs. Vernon, I am sorry to have to push you, but we need to know and if you could not do that, why now is the time to tell us and there is nothing wrong with it whatsoever.
A No, I couldn't.
Q You could not?
A No, sir.
Q And that is—I appreciate your telling us and do you tell us no matter what kind of case it was if you were the juror you couldn't vote to give the death penalty?
A No.
Q Okay.
I take it, Mrs. Vernon, and that is an affirmative opinion that you have?
A Yes.
Q All right.
[PROSECUTOR]: We challenge, Your Honor.
THE COURT: All right.
The challenge is allowed and granted on the basis of Witherspoon versus Illinois.
Mrs. Vernon, you are excused from jury service. (Whereupon, Juror number sixty-five excused.)"

Then after the challenge was sustained and after the juror was excused, defense counsel excepted to the court's ruling because she never did say "she would automatically vote against the death penalty" in every case. Appellant's counsel did

not ask any questions of this person, and did not timely object to the court's ruling excluding her from jury service. His objection was made after she had been excused and retired from the venire panel. The trial judge was present to hear the tone of voice and observe the demeanor of the person; he certainly interpreted this answer to mean (as the context shows it to mean), "No, I couldn't." Her responses were tantamount to an admission that her personal beliefs about the imposition of the death penalty would prevent her from being an impartial juror. We find Mrs. Vernon was not excused in violation of the standards of Witherspoon. See *White v. State*, Tex.Cr. App., 543 S.W.2d 104 (1976); *Tezeno v. State*, Tex.Cr.App., 484 S.W.2d 374. Appellant's second ground of error is overruled.

Appellant's third ground of error alleges the indictment is fundamentally defective for failure to allege the elements of aggravated rape and the name of the victim.

Omitting the formal parts, the indictment alleges appellant on or about October 7, 1974, "did then and there intentionally and knowingly cause the death of an individual, NATASHA McClendon, by cutting the said NATASHA McCLENDON with a knife, and that the said Kenneth Granviel was then and there in the course of committing and attempting to commit aggravated rape."

Appellant's motion to quash the indictment which set forth the same defects now urged on appeal was filed the 12th day of the trial and was overruled by the trial court.

In *Vaughn v. State*, 530 S.W.2d 558, this Court held an indictment alleging burglary of a habitation with intent to commit injury to a child could not be challenged on appeal for failure to name the child absent a written motion to quash. Appellant's motion to quash, filed eleven days after commencement of the trial, was not timely. *Bond v. State*, 171 Tex.Cr.R. 119, 345

S.W.2d 520. Appellant may not now complain of the failure to name in the indictment the victim of the aggravated rape.

In *Smith v. State*, 540 S.W.2d 693, we held that an indictment for capital murder under Art. 1257, V.A.P.C. was not fundamentally defective because it did not set out the elements of robbery in an indictment charging murder during the commission or attempted commission of robbery.

Appellant contends the cases relied on in *Smith*, supra,[2] are distinguishable because "the actual commission of the offense of aggravated rape is a prerequisite to the commission of capital murder based on aggravated rape" and "the 'aggravated rape' in a capital murder case must be a completed act." Appellant's argument is without merit. V.T.C.A., Penal Code, Sec. 19.-03(a)(2) defines capital murder as murder committed "in the course of committing or attempting to commit kidnapping, burglary, robbery, aggravated rape or arson." Appellant was indicted for capital murder in the course of committing or attempting to commit aggravated rape. Thus the actual commission of aggravated rape is not prerequisite to the commission of capital murder under Sec. 19.03(a)(2), supra. See and compare *Livingston v. State*, Tex.Cr.App., 542 S.W.2d 655 (1976).

Appellant contends that the attorney-client privilege was violated by the State's subpoenaing and calling to the witness stand psychiatrist John T. Holbrook, who was appointed to examine appellant at the request of appellant's court appointed counsel. Appellant contends that Dr. Holbrook was an agent of appellant's trial counsel because he was employed to assist them in the preparation of the defense in the trial. The appellant's only defense is that he was insane at the time of the commission of the offense.

On the written request of appellant the court appointed Charles Dickens and Frank

**2.** These cases are *Gonzales v. State*, Tex.Cr. App., 517 S.W.2d 785; *Watts v. State,* Tex.Cr. App., 516 S.W.2d 414; and *Earl v. State*, Tex. Cr.App., 514 S.W.2d 273. These cases hold indictments for burglary with intent to commit theft and for aggravated robbery need not allege the elements of theft.

Sullivan, Esquires, practicing attorneys, to defend him on February 13, 1975. Appellant's counsel then contacted Dr. Holbrook, a psychiatrist, some time before April 26, 1975, and requested him to examine appellant in the Tarrant County Jail. These examinations were made on April 26 and May 16, 1975. Present at both examinations were the psychiatrist, appellant and counsel. Dr. Holbrook stated that appellant satisfactorily communicated with him and responded to his questions during the examination.

On May 22, 1975, upon counsel's written motion, the trial court appointed Dr. John T. Holbrook "to examine the defendant in the Tarrant County Jail at any and all times that are convenient both to Dr. John Holbrook and the Sheriff". On the same date the court upon appellant's counsel's written notice appointed Dr. M. Jerold May to administer psychological tests to appellant at his office in Fort Worth, which tests were made at a later date. On August 9, 1975, upon the State's request the court appointed Dr. Hugh Brown, a psychiatrist, to examine appellant at the Tarrant County Jail. Dr. Brown wrote the court of his inability to examine appellant because appellant refused to talk to him without his counsel being present. Dr. John Methner, a court appointed psychiatrist requested by the State, testified that on April 13, 1975, when he tried to examine the appellant in the presence of his counsel, he was unable to do so because appellant refused to talk to him or cooperate for the examination. Counsel stated that he advised the appellant that he did not have to talk to the psychiatrist (Dr. Methner); however, the psychiatrist did get to observe appellant for a while.

Art. 46.02, Sec. 2(f), V.A.C.C.P., as amended August 30, 1971, and effective at the date of the appointment of Dr. Holbrook on May 22, 1975, provides:

"(1) The court may, at its discretion appoint disinterested qualified experts to examine the defendant with regard to his present competency to stand trial and as to his sanity, and to testify thereto at any trial or hearing in connection to the accusation against the accused . . .

* * * * * *

(4) No statement made by the defendant during examination into his competency shall be admitted in evidence against the accused on the issue of guilt in any criminal proceeding no matter under what circumstances such examination takes place. (5) Any party may introduce other competent testimony regarding the defendant's competency."

Under this statute, the trial court's allowing Dr. Holbrook to testify was proper. "[A]ppoint disinterested qualified experts to examine the defendant . . ." clearly means that such expert is not appointed by the court as the expert of the State or the defense, but is the court's disinterested expert. He may appoint such expert at his discretion and without a motion therefore, and either party may subpoena such witness. Therefore, no attorney-client privilege exists as to Dr. Holbrook.

In *Stultz v. State*, 500 S.W.2d 853, this Court said:

"A psychiatric examination *is not an adversary proceeding*. Its purpose is not to aid in establishment of facts showing that an accused committed certain acts constituting a crime; rather, its sole purpose is to enable an expert to form an opinion as to an accused's mental capacity to form a criminal intent.

Because of the intimate, personal and highly subjective nature of a psychiatric examination, *the presence of a third party in a legal and non-medical capacity would severely limit the efficacy of the examination* . . ." (Emphasis added)

Compare *Walker v. State*, 19 Tex.Crim.R. 176 (1885). See also *Gholson v. State*, Tex. Cr.App., 542 S.W.2d 395 (1976).

Art. 46.03, Sec. 3, V.A.C.C.P. effective June 19, 1975, provides as follows:

"(a) If notice of intention to raise the insanity defense is filed under Section 2 of this article, the court may, on its own motion or motion by the defendant, his

counsel, or the prosecuting attorney, appoint disinterested experts experienced and qualified in mental health or mental retardation to examine the defendant with regard to the insanity defense and to testify thereto at any trial or hearing on this issue, but the court may not order the defendant to a state mental hospital for examination without the consent of the head of the state mental hospital.

\* \* \* \* \* \*

(d) A written report of the examination shall be submitted to the court within 21 days of the order of examination and the court shall furnish copies of the report to the defense counsel and prosecuting attorney. The report shall include a description of the procedures used in the examination and the examiner's observations and findings pertaining to the insanity defense.

\* \* \* \* \* \*

(g) The experts appointed under this section to examine the defendant with regard to the insanity defense also may be appointed by the court to examine the defendant with regard to his competency to stand trial pursuant to Section 3 of Article 46.02 of this code, provided that separate written reports concerning the defendant's competency to stand trial and the insanity defense shall be filed with the court."

Cf. Article 46.02, Sec. 3, V.A.C.C.P. (Incompetency to stand trial).

■ A procedural statute controls litigation from its effective date. *Wilson v. State*, Tex.Cr.App., 473 S.W.2d 532. The trial of the instant case was in October 1975, and Article 46.03, Sec. 3, supra, was then effective and controlling. *Wilson*, supra. Cf. *McCarter v. State*, 527 S.W.2d 296.

Articles 46.03 and 46.02, supra, negate the contention of appellant that the attorney-client privilege was violated. Both the

State and appellant had the right to subpoena the psychiatrist and adduce his testimony at the trial. There is no difference in the result when the examinations were completed before the appointment was made, as in the instant case, and when a psychiatrist is appointed by the court and then makes his examination.

■ Communications between a physician and his patient are not privileged under Texas Law. Texas has no statute establishing the privilege and the courts invariably deny its recognition. See *Bonewald v. State*, 157 Tex.Cr.R. 521, 251 S.W.2d 255.

The general rule is that communications between physicians and patients in the absence of statute are not privileged. *Dodd v. State*, 83 Tex.Cr.R. 160, 201 S.W. 1014, 1015.

Our statute does not exempt a physician and his patient relationship as privileged communications.

Art. 38.10, V.A.C.C.P., effective June 15, 1971, provides:

"All other persons except those enumerated in Articles 38.06,[3] 38.101[4], and 38.11[5], whatever may be the relationship between the defendant and witness, are competent to testify, except that an attorney at law shall not disclose a communication made to him by his client during the existence of that relationship, nor disclose any other fact which came to the knowledge of such attorney by reason of such relationship."

There is no affirmative evidence in the instant case showing that Dr. Holbrook revealed any fact or communication between him and appellant showing that appellant committed a *crime of any nature*. The testimony shows to the contrary that Dr. Holbrook never communicated to anyone in the district attorney's office any such statements or facts, if any, resulting from the

---

**3.** Art 38.06 excepts insane persons, children or other persons who do not possess sufficient intellect to relate transactions and do not understand the oath.

**4.** Art. 38.101, Communications with persons in the treatment or examination of drug abusers, etc.

**5.** Husband or wife as witnesses against each other in criminal prosecutions.

examinations he made of appellant as to his sanity or his competency. Therefore, Article 46.02, Sec. 2(f)(4), supra, and Article 46.03, Sec. 3, supra, have not been violated.

Appellant claims that Dr. Holbrook's examination was necessary to his defense of insanity and failure to request the examination would have been ineffective assistance of counsel. Appellant contends that by employing Dr. Holbrook he created an involuntary State's witness who gave testimony adverse to appellant relating to Special Issue No. 2 under Article 37.071(b)(2), V.A.C.C.P. In view of our previous discussion of the status of Dr. Holbrook as a disinterested expert witness under Articles 46.02, Sec. 2(f) and 46.03, Sec. 3, this contention is without merit.

██ Appellant further contends that the trial court erred when it ordered that the report of Dr. May, a psychologist appointed at appellant's request, be turned over to the State. This was proper under Article 46.03, Sec. 3(d), supra. Grounds of error four and five are overruled.

██ Appellant's sixth, seventh and eighth grounds of error allege denial of due process under Art. 37.071(b)(2), V.A.C.C.P. Appellant contends the phrase "a probability" is vague and overbroad and presents no intelligible standard to guide the jurors in their deliberations.

In *Jurek v. State*, 522 S.W.2d 934, this Court rejected the contention that Art. 37.-071 was too vague to provide adequate guidance to the jury, notwithstanding the absence in the statute of an exhaustive and precise list of factors. This Court then enumerated viable and readily apparent factors for the jury's consideration "in determining the likelihood[6] that the defendant would be a continuing threat to society." *Jurek*, at page 939. See also *Jurek v. Texas*, supra, 428 U.S. 262, 96 S.Ct. at 2956; *Gholson v. State*, supra.

6. "Likelihood" is one of the definitions for "probability" in Webster's Unabridged Dictionary, 2d Ed. (1948). Other definitions of the word probability include "reasonable ground for presuming", "true, real, or likely to occur",

Art. 3.01, V.A.C.C.P. provides that words and phrases not specifically defined "are to be taken and understood in their usual acceptance in common language." Words defined in dictionaries and with meanings so well known as to be understood by a person of ordinary intelligence have been held not to be vague and indefinite. See *McMorris v. State*, Tex.Cr.App., 516 S.W.2d 927; *Page v. State*, Tex.Cr.App., 492 S.W.2d 573.

We hold the phrase "a probability" as that term appears in Art. 37.071(b)(2), supra, is not so vague that men of common intelligence must guess as to its meaning and differ as to its application. See also Art. 37.071(c), V.A.C.C.P., which provides that the probability that the defendant would commit criminal acts of violence must be proved beyond a reasonable doubt. Appellant's sixth ground of error is overruled.

██ Appellant also contends the punishment of death for future conduct authorized by Art. 37.071(b)(2), supra, is unconstitutional. The Supreme Court of the United States in *Jurek v. Texas*, supra, was confronted with the argument that it is impossible to predict future behavior and that Art. 37.071(b)(2), supra, is so vague as to be meaningless. The Supreme Court wrote:

"It is, of course, not easy to predict future behavior. The fact that such a determination is difficult, however, does not mean that it cannot be made. Indeed, prediction of future criminal conduct is an essential element in many of the decisions rendered throughout our criminal justice system.

\* \* \* \* \* \*

The task that a Texas jury must perform in answering the statutory question in issue is thus basically no different from the task performed countless times each day throughout the American system of criminal justice. What is essential is that

"a conclusion that is not proof but follows logically from such evidence as is available", "in the doctrine of chance, the likelihood of the occurrence of any particular form of an event".

the jury have before it all possible relevant information about the individual defendant whose fate it must determine. Texas law clearly assures that all such evidence will be adduced." 96 S.Ct. at pages 2957–2958.

Appellant's seventh ground of error is overruled.

Appellant asserts Art. 37.071(b)(2), supra, has a chilling effect on the defense of insanity. Appellant claims he is in the position of not using an expert witness on the issue of insanity or running the risk of having his own expert testify on cross examination to matters relating to punishment.

In support of this contention appellant points to the following question asked of Dr. May during cross examination at the guilt stage of the trial:

"Q [BY PROSECUTOR]: He is, is he not, a dangerous individual, is he not?
A Definitely.
[DEFENSE ATTORNEY]: I am going to object. That is not relevant at this point. It is not relevant in this part of the trial.
THE COURT: Overruled.
[DEFENSE ATTORNEY]: Note my exception."

■■■ Appellant's objection was not timely because this information was already before the jury. Prior to the testimony quoted above, the following occurred:

"Q [BY PROSECUTOR]: Doctor, [Dr. May] do you not think this man is a dangerous individual?
A I certainly do."

This testimony was received without objection. Appellant waived any objection to the testimony now complained of. *Sherbert v. State*, Tex.Cr.App., 531 S.W.2d 636; *Guzman v. State*, Tex.Cr.App., 521 S.W.2d 267.

Appellant also directs our attention to the following testimony on cross examination at the guilt stage of the trial:

"Q [BY PROSECUTOR]: Dr. May, do you have an opinion based upon your

experience and your examination of Kenneth Granviel, as to whether or not there is a probability that he would commit criminal acts of violence in the future so as to constitute a continuing threat to society?
[DEFENSE ATTORNEY]: I'm going to object. That is not relevant at this stage of the hearing and besides, this is our own witness and we are heading up with 37.071(b)(2) again, which we have got motions in the record and it's immaterial at this point in the testimony.
THE COURT: Sustain the objection.
[DEFENSE ATTORNEY]: I will ask the court to instruct the jury to disregard counsel's question.
THE COURT: Ladies and gentlemen, disregard the last question.
[DEFENSE ATTORNEY]: At this point, the Court has done all within its power to eradicate the prejudicial question of the prosecutor and I would ask for a mistrial.
THE COURT: Motion is overruled."

■■■ Although the question was not relevant at the guilt or innocence phase of the trial, the question was not answered. The trial court's action in instructing the jury to disregard the improper question removed any prejudicial effect. *Smith*, supra; *Carey v. State*, Tex.Cr.App., 537 S.W.2d 757; *Ashley v. State*, Tex.Cr.App., 527 S.W.2d 302. We cannot agree that Article 37.071(b)(2) itself has a chilling effect on the defense of insanity, because nothing therein authorizes the cross examination of an expert witness for the defense on insanity as to matters relating to punishment which should be developed at the penalty stage of the trial.

Ground of error eight is overruled.

In his ninth ground of error appellant complains of the State's failure to tender appellant's 1969 Texas Youth Council Record to the defense before trial in compliance with court-ordered discovery of records pertaining to appellant's mental condition.[7]

---

7. In a pre-trial hearing the trial judge described the scope of the order as including matters "[S]uch as reports from psychiatrists, psychologists, medical reports, experts, any neighbor or acquaintance who might allege to have known the defendant 25 years and he is far out or not far out. That type of thing."

Appellant does not complain that he was deprived of the record, only that it was not furnished until two weeks into the trial. The report consists of 52 pages containing personal history, discipline reports, incident reports and medical examinations.

During direct examination, Dr. Grove, a psychiatrist testifying for the State, was given the report in order to refresh his memory. Dr. Grove's report comprised one page from appellant's 52 page file. Appellant objected and the trial court instructed the prosecution to furnish a copy of the report to the defense for cross examination purposes. The trial court had the record marked and introduced only for purposes of the record.

The State argues that this case is controlled by *Florio v. State*, Tex.Cr.App., 532 S.W.2d 614. In *Florio* the defendant made a motion for discovery of all scientific tests, including blood tests. The defendant then introduced his service revolver into evidence, following which the State called an expert witness who testified that traces of blood had been found on the butt of the gun. The defendant had no knowledge of these test results. He argued that he would not have introduced the gun into evidence if he had known about the traces of blood. This Court held that although fairness required that the State disclose the test results to the defendant, we could not conclude that evidence materially affected the determination of guilt.

■ Similarly, in the instant case, fairness required that the State turn over a copy of the report when it came into the State's possession. There is no merit to the argument that it was relieved of this burden because it did not have a copy of the report at the time the court ordered discovery or because appellant failed to show at what time the State obtained possession of the report. The State is under a continuing burden of disclosure. *Smith v. State*, Tex.Cr.App., 516 S.W.2d 415.

■ However, on the facts of this case we cannot conclude that the State's delay in furnishing the report constitutes reversible error. Dr. Grove used the one page report to refresh his memory and testified that appellant was not suffering from mental illness, but had a psychopathic disorder. There were other State psychiatric witnesses with similar testimony. Furthermore, appellant cannot claim surprise, since defense counsel was aware that appellant had been in the Texas Youth Council facilities in Gatesville and it would be reasonable to assume that he had a Texas Youth Council record. Appellant points out there was a notation in the 52 page record requesting that appellant consult with a psychiatrist, "to determine whether or not there are any important psychological problems and to seek assistance in the formulation of plans for the subject." He argues that this notation is enough to show "that a potential defense witness was concealed by the State's failure to comply with the court's orders." We disagree. We conclude, as we did in *Florio*, that knowledge by appellant's counsel during the trial of the notation in appellant's juvenile record that psychological consultation was requested would not have had a material effect on the outcome of the trial. We cannot conclude it was reversible error.

■ In his tenth ground of error appellant asserts the selection of prospective jurors in Tarrant County from the lists of registered voters deprived appellant of his constitutional right to be tried by a jury representing a cross section of the community.

In *Nolan v. U. S.*, 395 F.2d 283 (5th Cir. 1968), the Fifth Circuit Court of Appeals said:

"The fact that the list was compiled primarily from a list of registered voters does not show that the list did not reflect a fair cross section of the community." Id. at page 286.

In *Shelby v. State*, Tex.Cr.App., 479 S.W.2d 31, the defendant contended that selection of prospective jurors in Lubbock County from voter registration lists result-

ed in juries which did not reflect a cross section of the population of the county. In upholding this manner of filling the jury wheel, this Court said:

"We simply cannot conclude on the basis of the record before us or as a matter of judicial notice that the use of the voter registration list as the sole source for prospective jurors deprived this appellant of due process and equal protection of the laws, nor are we prepared to announce in light of presently available information, a per se constitutional rule requiring the reversal of every conviction returned by a jury selected as this one was." Id. at page 40.

Appellant contends he has now supplied the information necessary to show that jurors selected from the lists of registered voters does not represent a cross section of the community. Appellant offered the testimony of witness Stacy, an expert witness in the field of demography. Stacy testified that based on the 1972 Bureau of Census Publication compiled from the 1970 census, there were 423,000 people in Tarrant County over the age of 18 and there were 298,-000 voters.

Appellant introduced as defense exhibit one a profile of the economic, social demographic characteristics of Tarrant County. Witness Stacy testified as to the racial composition of the county; the employment status, occupation classification, educational level, and marital status for all races; the percentage of races by sex; the proportion of owner occupied and renter occupied housing according to race; and the mean and median income of each race for families and for unrelated individuals.

In response to a hypothetical question, Stacy stated twelve jurors with the same characteristics as the twelve jurors in the instant case were not representative of a cross section of the community, because they were older, more educated, earned a higher average income, were unbalanced sexually and racially, and proportionately more of the jurors were married and owned their own homes. In response to the court's inquiry, Stacy stated any jury in Tarrant County selected in the same manner as the hypothetical jury (i. e., from voter registration lists) would be very similar in economic, social and demographic characteristics to the hypothetical jury.

Appellant does not contend a particular race has been systematically excluded from the jury selection process. See *Rodriguez v. State,* Tex.Cr.App., 513 S.W.2d 22. Nor does appellant suggest that petit juries should be racially proportionate. See *Partida v. State,* Tex.Cr.App., 506 S.W.2d 209. Appellant's contention, if we understand the same, is the method of selecting prospective jurors from voter registration lists is patently unconstitutional because it results in jurors of above average income, education and age, and in jury panels which are unbalanced sexually and racially. In *U. S. v. Dangler,* 422 F.2d 344, 345 (5th Cir. 1970) the Fifth Circuit said:

"We have approved the use of voter registration lists as the sole source of names for jury duty unless it results in the systematic exclusion of 'a cognizable group or class of qualified citizens.' *Camp v. U. S.,* 5th Cir. 1969, 413 F.2d 419. And we have held that those who do not choose to register cannot be considered a cognizable group. *Grimes v. U. S.,* 5th Cir. 1968, 391 F.2d 709, cert. denied, 393 U.S. 825, 89 S.Ct. 87, 21 L.Ed.2d 96."

Appellant has not established a prima facie case of discrimination or systematic exclusion of a cognizable group or class of qualified citizens. This ground of error is overruled.

Appellant complains that the trial court erred by admitting into evidence 18 pages of medical records from John Peter Smith Hospital about appellant's sanity in 1967 on the grounds that these records were a written report which was hearsay and inadmissible.

The trial court allowed appellant to reopen this case after closing of the guilt-innocence stage. Appellant then testified about this alleged crime and examinations by psychiatrists, medical doctors and other matters including the 1967 stay in the hospital. After the conclusion of appellant's

testimony, the State introduced the medical records for the purpose of rebuttal of appellant's testimony. These records were introduced under the Business Records Act, Art. 3737e, Sec. 5, V.A.C.S., which provides:

"Any record or set of records or photographically reproduced copies of such records, which would be admissible pursuant to the provisions of Sections 1 through 4 shall be admissible in evidence in any court in this state upon the affidavit of the person who would otherwise provide the prerequisites of Sections 1 through 4 above, that such records attached to such affidavit were in fact so kept as required by Sections 1 through 4 above, provided further, that such record or records along with such affidavit are filed with the clerk of the court for inclusion with the papers in the cause in which the record or records are sought to be used as evidence at least fourteen (14) days prior to the day upon which trial of said cause commences, . . ."

The required affidavit was properly executed by Dorothy Copus, Custodian of the Medical Records of the hospital, attached to the medical records and was sworn and subscribed to before a Tarrant County Notary Public on September 26, 1975. This affidavit complies with the recommended form in Art. 3737e, Sec. 7, V.A.C.S. See *Moton v. State,* Tex.Cr.App., 540 S.W.2d 715.

Appellant's objection to the admission of the medical records was "on the grounds of hearsay." The trial court overruled the objection and admitted the records. At this time the State started to read the affidavit attached to the medical records. Appellant's counsel requested that he discuss a matter of law. The jury was then retired and a proceeding was held. Appellant's counsel objected: "I take it at this time the State is trying to reopen its case and I would object to that". The State replied explaining to the trial court about the medical records and stated, "We offer them for that purpose of rebuttal of his [appellant's] testimony." The Court stated: "I am of the opinion they are admissible. Objection

overruled." Appellant's counsel then stated he had nothing further to offer at that time. The jury was then returned to the jury box.

The State then read the affidavit and from the medical records to the jury. Appellant's counsel again objected that Dr. Muller's notations in the medical records "are conclusions—and hearsay". The trial court overruled the objections. At this time appellant's counsel requested "the District Attorney or somebody can read the entire evidence to the jury or I assume they can take it back to the jury room and read it themselves. There is [sic] things he left out." The court replied: "The exhibit is in evidence and should the jury desire to have the evidence, they may have it." Then the parties closed the case.

Appellant now claims that the medical records are not admissible because Art. 3737e, Sec. 5, supra, was not complied with in that it requires the medical records introduced be on file 14 days before the trial. The only date on the records is September 25, 1975 (the date of the affidavit by the custodian of the hospital medical records) which appellant's counsel used in his belated contention that 11 days only lapsed before the records were admitted in evidence herein. The record reveals the trial began on October 6, 1975.

This Court held in *Coulter v. State,* Tex.Cr.App., 494 S.W.2d 876, 883:

"The statute permitting the admission of such records should be liberally construed but not mechanistically applied."

This act is applicable to criminal cases. *Coulter,* supra.

The objections on the record of the instant case were too general and untimely without stating the specific grounds and pointing them out to the court. An objection must be made as soon as the ground of objection becomes apparent. *Forbes v. State,* Tex.Cr.App., 513 S.W.2d 72, 80, and cases cited therein; *Williams v. State,* Tex.Cr.App., 531 S.W.2d 606. It is not error to overrule an objection that is to general to advise the trial court of that

portion of the exhibit to which the objection is directed. *Bouchillon v. State,* 540 S.W.2d 319. See also *Argonaut Southwest Insurance Company v. Morris,* 420 S.W.2d 760 (Tex.Civ.App.1967). Admission or exclusion of hospital records is not reversible error in absence of a showing of harm to the complaining party. *Argonaut Insurance Company v. Titus,* 347 S.W.2d 372 (Tex.Civ.App. 1961).

In addition to appellant's testimony, there is evidence in the records about diagnosis of appellant's sanity by medical doctors and specialists in the medical profession. *Huff v. Insurance Company of North America,* 394 S.W.2d 849 (Tex.Civ.App.1965) (n. r. e.), held an unsigned typewritten copy of a doctor's medical record in a workmen's compensation case was not offered in compliance with Art. 3737e, supra, and was properly excluded by the court but, in the event its exclusion was improper, any resulting error was harmless and would not require a reversal against claimant.

■ Appellant contends in his brief that he was denied the opportunity to cross examine Dr. Muller, who did not testify, and that the medical records contain (a) a diagnosis that appellant was "found to be intelligent and no [sic] psychotic" that does not rest on a reasonable medical certainty, and (b) there is no proof that the information upon which Dr. Muller relied was "a memorandum or record of an act, event or condition" made by "an employee or representative" of the hospital "with personal knowledge of such act, event or condition", as required by Art. 3737e, Sec. 1(a) and (b), supra. There was no objection made on these grounds at the trial and no harm has been shown; therefore the complaint comes too late.

■ A recorded diagnosis is hearsay evidence in hospital records, but is admissible if the diagnosis is one upon which competent physicians would normally agree. *Eubanks v. Winn,* 469 S.W.2d 292 (Tex.Civ.App.1971) (ref. n. r. e.)

8. Art. 37.071(b)(1) states:

"(1) whether the conduct of the defendant that caused the death of the deceased was

It would be unusual for a medical doctor to write a legal predicate in the hospital record of his diagnosis of his patient "that my diagnosis is ——— and my decision rests on a reasonable medical certainty" (or probability).

Dr. Muller signed his own report in the medical records on March 27, 1967, and relied on his own observation and examinations of the appellant during his six day stay in the John Peter Smith Hospital and in all probability relied on the information from his mother, brother and Juvenile Probation Officers that assisted in subduing appellant and bringing him to the hospital. See and compare *Gonzales v. Gilliam,* 506 S.W.2d 650 (Tex.Civ.App.1974).

There being an untimely and general objection and no showing of harm, ground of error eleven is overruled.

■ Appellant's twelfth ground of error complains of the refusal of the trial court to include in the court's charge to the jury appellant's specially requested charge No. 1. Appellant timely filed a written instruction which would have informed the jury of the effect of a finding of not guilty by reason of insanity under the provisions of Art. 46.03, Secs. 4(a) and 4(b), V.A.C.C.P.

The jury was charged on the law applicable to the defense of insanity under V.T. C.A., Penal Code, Sec. 8.01. Viewing the charge as a whole, failure to submit appellant's requested charge was not calculated to injure appellant's rights. See Art. 36.19, V.A.C.C.P.

We find Art. 46.03, supra, to be directory and a guideline for the trial court rather than a matter for the jury's concern. The trial court did not err in denying appellant's specially requested charge.

■ Appellant claims the evidence is insufficient to support the jury's answer of "yes" to Special Issue No. 1[8] of Art. 37.071, V.A.C.C.P. He argues that the evidence

committed deliberately and with the reasonable expectation that the death of the deceased would result;"

does not show that the killing of Natasha McClendon was the result of any "premeditation" or deliberation. He asserts that his purpose in going to the McClendon apartment was to have sexual intercourse with Laura McClendon (Natasha's aunt), not to kill anyone. Therefore, appellant contends Natasha's killing had none of the characteristics of a "weighed", "pondered upon" act because it "occurred in a frenzy". We do not agree with appellant's interpretation of Art. 37.071(b)(1), supra. The statutory requirements that appellant's conduct be committed *deliberately* does not mean that it must be a *premeditated* act. There is sufficient evidence in the record from which jury could conclude that when appellant deliberately stabbed the bound and gagged two year old Natasha nine times as she lay on the floor and the bed, he could reasonably expect that her death would result.

 Appellant further challenges the sufficiency of the evidence to warrant the jury's answer of "yes" to Special Issue No. 2 [9]. However, four months after the events surrounding Natasha's death, appellant engaged in similar conduct: he killed two women in his apartment, raping one of them. Appellant then drove to the home of a third woman, where he repeated behavior similar to that he exhibited four months earlier in the McClendon apartment by again tying up the children while raping the women.

Appellant argues that under *Smith v. State*, Tex.Cr.App., 540 S.W.2d 693, the jury did not have sufficient evidence to support the punishment assessed. In *Smith,* this Court examined the sufficiency of the evidence to support an affirmative answer to Special Issue No. 2 and considered the following factors: defendant's prior narcotics charges; defendant's failure at rehabilitation and lack of employment; the fact that he was not under a mental or emotional pressure nor was he acting under the domination of some third person; his lack of remorse after the killing; and psychiatric testimony that defendant had a sociopathic personality and would be likely to have the same patterns of conduct in the future. This Court held that evidence was adequate to uphold the jury's affirmative answer to Special Issue No. 2.

Appellant attempts to distinguish the instant case from *Smith* in several ways. He urges that if rehabilitation and steady employment are criteria taken into consideration, he has a history of steady employment and a strong religious background. He notes further that as to the issue of remorselessness, appellant turned himself in, at which time he expressed the desire to "get . . . some help". Finally appellant distinguishes the psychiatric testimony given in each of the cases. In *Smith,* the testimony indicated that there was "no cure for persons who were suffering from the type of personality disorder demonstrated by appellant." In the instant case there was State's evidence by John P. Methner, D.O., that appellant didn't have a major mental illness, but had an antisocial personality disorder. He testified that patients with severe antisocial personality disorders often tend to "burn out" between the ages of 35 through 42.

In answering Special Issue No. 2, the jury had before it evidence of the second incident of similar violent behavior. Additionally, Dr. Methner testified there was a high frequency of repetitiveness in terms of aggressive behavior among those with severe personality disorders. He noted that one of the characteristics of the disorder is that the patient cannot learn from past behavior and tends to be repetitive. We hold this evidence is sufficient to uphold the jury's finding that there was a probability that appellant would constitute a continuing threat to society. See *Moore v. State,* Tex. Cr.App., 542 S.W.2d 664 (1976). Appellant's thirteenth ground of error is overruled.

 As we understand appellant's fourteenth ground of error, he complains that

---

9. Art. 37.071(b)(2) states:

"(2) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society;"

the trial court erred in overruling his motion to prevent the State from qualifying the jury on the death penalty. V.T.C.A., Penal Code, Sec. 12.31(b), requires that prospective jurors be informed of the mandatory death sentence or life imprisonment on the conviction of a capital felony. It further provides that a juror will be disqualified unless he states under oath that such mandatory punishment will not affect his deliberation of any issue of fact.

Appellant argues that Sec. 12.31(b) is unconstitutional "because it denies defendant the right to be tried by a representative jury during the guilt-innocence stage of the trial." Appellant cites various post-*Witherspoon* surveys which tend to show that the same people who can be "death-penalty qualified" are also likely to be "conviction-prone".

Art. 35.16(b), V.A.C.C.P., permits the State to challenge a prospective juror for cause if it is shown:

"1. That the juror has conscientious scruples in regard to the infliction of the punishment of death for crime, in a capital case, where the State is seeking the death penalty;

\* \* \* \* \* \*

3. That he has a bias or prejudice against any phase of the law upon which the State is entitled to rely for conviction or *punishment*." (Emphasis added).

We hold that Sec. 12.31(b) is a constitutionally permissible procedure for determining if such bias exists.

Appellant also claims he was denied equal protection "because a different jury selection process is employed against the class of persons accused of capital crimes without any rational or reasonable justification for applying such procedure." The Texas statutory scheme for capital murder, including the possible infliction of the death penalty, has been held constitutional. See *Jurek v. Texas*, supra. See also *Whitmore v. State*, Tex.Cr.App., (No. 52,325, delivered October 13, 1976); *Gholson v. state*, supra. Appellant's fourteenth ground of error is overruled.

The judgment is affirmed.

ROBERTS, J., concurs in the results.