**Juan Luis VILLARREAL, Appellant**

v.

**The STATE of Texas, Appellee.**

**No. 05–87–00404–CR.**

Court of Appeals of Texas,
Dallas.

April 26, 1988.

Rehearing Denied May 31, 1988.

Bruce Anton, Dallas, for appellant.

Teresa Tolle, Dallas, for appellee.

Before HOWELL, HECHT and THOMAS, JJ.

THOMAS, Justice.

A jury convicted Juan Luis Villarreal of murder and assessed his punishment at life imprisonment in the Texas Department of Corrections. In his sole point of error, appellant contends that the trial court erred in refusing to admit rebuttal testimony by his sister. We find no merit in appellant's arguments and, accordingly, affirm the trial court's judgment.

This case involves the death of Francisca Villarreal after she was shot by her husband, the appellant. At approximately 10:00 p.m. on September 5, 1986, Dallas police officers were dispatched to appellant's home to investigate a reported shooting. Upon arrival, the officers observed appellant sitting on the steps of the front porch drinking a beer. In response to questions, appellant told the officers that there had not been a shooting and there were not any problems at the house. When the officers asked if anyone else was in the house, appellant replied that his wife was inside watching television and they could go inside and talk to her if they wanted to. Satisfied with appellant's statements, the officers left without further investigation. The officers described appellant's manner as calm and casual.

Approximately forty minutes later, these same officers were dispatched to a nearby address where they spoke with Louis Amaro, appellant's brother-in-law. Based upon this conversation, they returned to appellant's home to make a further investiga-

tion. The officers noticed that the car was gone as was appellant and his cooler of beer. The front door was ajar and when the police entered the house they observed the body of the deceased on the couch slumped backwards in a seated position. The face and the upper portion of the body were covered with a shirt. A young man came along who told the officers where appellant could be located. The police went to this third location in order to arrest appellant.

### Evidence of the Shooting

The main issue at trial was whether the shooting was intentional or accidental due to appellant's negligence. Appellant stated at trial that the shooting was an accident which was caused by his wife pushing him as he was preparing to clean a rifle. While he acknowledged that he had been careless and negligent in the handling of the gun, he denied that he had intentionally shot his wife.

Appellant explained that on the day of the shooting, he had been working with Amaro in Waxahachie. Appellant took his rifle to work because Amaro wanted to use it. Since this was the first time the gun had been used, appellant said they shot at birds trying to get the scope set. They returned to Dallas around 4:00 p.m. and stopped to buy some beer. Appellant then went to the home of Amaro's brother in order to do some plumbing work. The deceased called twice to tell appellant to come home since he had promised to take her to play bingo. By the time appellant arrived home at 8:00 p.m., his wife, having consumed a number of beers, was angry and would not speak to him. They watched television for an hour or so and appellant had another two or three beers during that period. When the deceased still would not talk to him or fix anything to eat, he decided to go to Amaro's house to allow her time to "cool off". Appellant had a beer with Amaro and returned to his house approximately thirty minutes later. According to appellant, the deceased was sitting on the sofa opening the mail with a kitchen knife. Since she still would not talk to him, appellant said "to heck with it" and decided

he would clean his gun. The deceased told appellant not to clean the rifle in the living room and he told her that he would clean it wherever he wanted to. Appellant acknowledges that an argument followed.

Appellant then demonstrated for the jury how the shooting occurred. He claimed that as they were still arguing about whether he would clean the rifle in the living room, he started out of the bedroom with the gun in his hand. As he got near the sofa, the deceased again told him that she did not want him to clean the rifle in the living room and he kept going toward the sofa. He started across the coffee table and put one foot over when she reached up and pushed him back with her left hand. The deceased did not completely get up from the sofa and subsequently fell backwards. At this point, appellant caught his shoe on the table, staggered backwards, and fell against a wall. As the gun hit the wall, it went off hitting the deceased in the face. He testified that when he turned around and saw her face, he realized what had happened. After checking her pulse, he immediately covered her face with a shirt and called the police and Amaro.

According to appellant, he was sitting on the porch smoking a cigarette when the police arrived. He acknowledges that he told them he knew nothing of a shooting. At trial, appellant explained that he responded to the police in that manner because he was in shock and was not thinking. After the police left, he drove one block to his cousin Lupe's house because he needed to talk to someone. The police arrived and arrested him shortly thereafter.

Appellant denied at trial ever having given the police a version of the incident different from the one given at trial. For purposes of impeachment, the State introduced a statement which appellant had given to the police immediately after the arrest. In this statement, appellant related that he and his wife had argued about his cleaning the gun in the living room. Appellant stated that during the argument he slapped his wife and knocked her onto the couch. Further, he told her that he would use the knife she was holding on her if she

did not leave him alone. As the deceased started toward him again, he again knocked her onto the sofa. According to the statement, the deceased again started toward him and grabbed the barrel of the rifle. As they struggled, the gun accidently discharged.

Amaro testified that appellant had come to his house during the evening of the shooting, had a beer and stayed for approximately fifteen to twenty minutes. While appellant was at the house, he stated that he did not know what was the matter with "that crazy woman." Amaro took this to mean that appellant and the deceased were having some kind of problem, although appellant did not give any explanation. Amaro further testified that appellant later called and stated that he had shot his wife and that she had a knife. During this conversation, appellant did not mention that it was an accident. After the telephone call, Amaro had his nephew call the police in order to investigate the shooting.

When police officer Dodge arrived at the scene, he found the body of the deceased in a sitting position on the sofa with her legs crossed in a position consistent with one in which a person would watch television. She was grasping a knife with one hand, the blade side up, and the other arm was resting on the arm rest of the sofa. Dodge noticed that the bullet went through the body, the sofa, the wall, and exited outside the house. There did not appear to be any signs of a struggle, and in his opinion the deceased was shot exactly as she sat on the sofa and she simply slumped backwards after the shooting. There were no comparable prints other than appellant's on the rifle. The laboratory could not find any indication that the barrel had been handled by anyone.

According to Dallas County Medical Examiner, Dr. Charles Petty, the autopsy revealed a gunshot wound to the right side of the deceased's face. There was no evidence to indicate that there had been a struggle prior to the shooting such as cuts, wounds, scrapes or bruises. Because Dr. Petty found no evidence of soot deposit or powder tattooing, he stated that the muzzle of the rifle had to have been at least three to five feet away from the deceased at the time of the shooting. The deceased could not have been close enough to the gun to have had it within her reach. It was Dr. Petty's opinion that the deceased was sitting on the sofa with her legs crossed and her head upright when the shot was fired.

Dr. Petty then explained that a scenario where the deceased was shot while leaning forward and then had fallen backwards was not consistent with the position in which she was found, nor with the position of the defect made by the bullet in the back of the sofa. Further, Dr. Petty indicated that he would not expect her to have landed on the sofa with her legs crossed if she had just been slapped or shoved onto the sofa. The injury was consistent with the deceased having been shot from the bedroom door. Dr. Petty found nothing to indicate that she saw anything coming and then tried to take some evasive action. Finally, Dr. Petty testified that the grasp on the knife was consistent with appellant placing it in her hand; however, there was no way to tell from the photographs whether she in fact had the knife in her hand prior to the shooting.

### Character Evidence

Inasmuch as there were no witnesses to the shooting, and appellant was claiming that his wife's death was an accident and not an intentional murder, as charged by the State, appellant put into issue his character for being a peaceful and law-abiding person who would not intentionally inflict harm upon another. Appellant testified on his own behalf and called approximately seven witnesses who testified to: 1) his peaceful nature, even when drunk; 2) the close relationship he had with his wife; and 3) the difficulty he was having with the recent death of his parents.

To rebut the testimony of appellant's peaceful character, the State presented four witnesses, including appellant's ex-wife, Gladys Villarreal. Gladys had been married to appellant from 1971 to 1974 and then continued to live with him on and off until 1977. Although she had not had

much contact with appellant the last ten years, she stated that she knew what kind of person appellant was during their marriage and a few years afterwards. In her opinion, appellant was not a peaceful individual; rather, he was a violent person, particularly when he was drinking. Gladys felt that his heavy drinking contributed to his violent temper and his inability to keep a steady job.

Gladys testified to weekly beatings, which began a month after they were married. The arguments concerned money, his drinking, or his drinking while driving. Gladys described one incident where appellant came home late after being out drinking. He wanted Gladys to make some fresh tortillas so he awakened her by pulling her off the bed by her hair. Gladys received cuts to her face when appellant kept hitting her with his ring and fists. Later, as they sat at the kitchen table, appellant pointed a gun at her and said that it would be so easy to kill her, put the gun in her hand and let the police think that she committed suicide. After that, appellant started hitting her until she passed out.

On another occasion, appellant came home after drinking and "wanted to argue." Gladys got out of bed to fix something to eat and appellant decided to call his girlfriend. Gladys became angry and an argument ensued. Appellant retrieved a rifle from the bedroom and slipped some shells into it. At the first opportunity, Gladys left out the front door to go to a neighbor's house. As she was running across the yard, Gladys heard a gunshot and turned to see appellant standing at the door with the rifle in his hand. Gladys stated that family members would often come to get her and the children after such beatings.

On cross-examination, Gladys testified that in her opinion their unhappy marriage was the appellant's fault and she felt as if she had given him ample opportunity to change his ways. Further, Gladys stated that when she struck or belittled him, it

was in self-defense. It was Gladys' opinion that appellant started ninety percent of the arguments between the two of them.

Helen Mendosa, Gladys' sister, testified concerning the physical altercations between appellant and Gladys during their marriage. Helen related that her family was often called and that she remembered seeing Gladys with bruises and swollen eyes. Helen particularly remembered being at the home following the shooting incident. Helen was also present during conversations where appellant acknowledged hitting Gladys. During the conversations, appellant would explain that she had asked for it because she had talked back or that he was having flashbacks to Vietnam or that he did not know why it happened because he was so drunk he couldn't remember. Helen acknowledged that she never knew who provoked the fights and it is possible that they could have been provoked by Gladys because of her temper and tendency to be stubborn. Helen did, however, observe that it was always Gladys who had the injuries and that appellant never had any marks on him. For this reason, Helen did not think that Gladys was "crazy" enough to strike the first blow.

■ After the State presented its rebuttal evidence, the defense sought to present a rebuttal witness, Mary Villarreal, appellant's sister, in order to impeach Gladys' testimony. Defense counsel explained that Mary left the courtroom before Gladys testified [1] and that Mary's testimony was necessary to show that it was Gladys who provoked the marital difficulties during the marriage. It was also argued that this testimony was necessary to establish the difference between the prior bad marriage and appellant's harmonious marriage to the deceased.

In a hearing to determine the admissibility of the testimony, outside the presence of the jury, Mary stated that she was familiar with both of appellant's marriages and that there was no comparison between the two

---

1. For this reason, the court overruled the State's objection that Mary could not be a witness because the Rule had been invoked and Mary had been in the courtroom during all other testimony.

of them. Mary was present during several of the frequent arguments between Gladys and appellant. Although both parties instigated fights, Mary thought Gladys started a lot of them.

Defense counsel asked Mary to give the court examples of how Gladys would provoke arguments. Mary explained that Gladys knew that appellant would get upset if other family members were brought into their matters. Mary recalled a situation at a family cookout on Mother's Day, where everyone was drinking. Gladys got upset and threw a baby bottle at appellant. Mary added that Gladys tended to throw anything in her hand when she was angry. Appellant told her to be quiet, but Gladys called to his mother. This upset appellant even more, and he asked Gladys to be quiet several more times. He then got up and slapped her. It was Mary's observation that Gladys would "push her limits" and that she had a mouth that "she couldn't control."

During the State's cross-examination, Mary testified that her brother did not have a short temper, nor did he become violent when drunk. He would lose his temper only after Gladys provoked him. The State repeated its objection to Mary being allowed to testify in violation of the rule. The court responded that if Mary testified at all, it would be "for the limited purpose of testifying as to any violence between Gladys and [appellant]."

The court then asked Mary if she ever saw a fight between Gladys and appellant where Gladys initiated the physical violence, and Mary cited the baby bottle throwing incident. At that, the court ruled that Mary could testify only to the bottle incident, its reason being that "[t]hat's the only thing that [Mary] can tell me that affects the defendant's reputation for violence or ... Gladys' reputation for provoking violence." Appellant objected to the court's limitation and withdrew Mary as a witness, stating that she had made her proffer to the court.

### Argument on Appeal

Appellant contends that the trial court erred in restricting Mary's testimony. Because the ex-wife had been allowed to make "broad, sweeping generalizations" about his character, he argues that he should be allowed "rejoinder on the same broad basis" in order to fairly counterbalance that testimony. At trial, appellant planned to prove with Mary's testimony that Mary witnessed instances where Gladys provoked the fights, in contradiction to Gladys' testimony, and appellant wanted to dispel the jury's impression that he beat his ex-wife for no reason at all. Mary was to be a rebuttal witness to Gladys, who, herself, was a rebuttal witness for the State. The issue, then, is the propriety of the trial court's exclusion of Mary's testimony.[2]

The question for the jury was whether appellant killed his wife negligently or intentionally, and in that regard, appellant chose to put his character for peacefulness into issue to prove that he did not intentionally shoot his wife. To rebut appellant's evidence of his peaceful character, the State presented evidence, including Gladys' testimony, of appellant's character for violence. *See* TEX.R.CRIM.EVID. 405; TEX. CODE CRIM.PROC.ANN. art. 36.01(7) (Vernon 1981); *Flannery v. State*, 676 S.W.2d 369, 370 (Tex.Crim.App.1984). When the State rested its rebuttal evidence, appellant then sought to have Mary testify before the jury to the fact that Gladys was not truthful when she stated that appellant provoked ninety percent of the arguments between the two of them.

Mary was going to state that in her opinion, from the several arguments she witnessed, Gladys initiated "a lot" of the altercations. Gladys' character for provoking fights was irrelevant to the issue of

---

**2.** The excluded evidence would have shown that it was Mary's opinion that Gladys provoked most of appellant's violent behavior, contrary to Gladys' testimony. We note that "excluded evidence" in this case refers to all that Mary would have testified to except the bottle throwing incident since the trial court admitted that testimony, and it was appellant who chose not to present the witness for that limited purpose.

appellant's character for violence [3] and was also irrelevant to Gladys' credibility as a witness. Therefore, the evidence would not have been admissible for that purpose. However, Gladys' character for truthfulness and veracity was indeed relevant to her credibility as a witness, and appellant certainly had the right to impeach her testimony if necessary. TEX.R.CRIM.EVID. 607, 608.

The question then becomes whether the court's limitation of Mary's testimony excluded proper and relevant impeachment efforts. It is true that great latitude should be allowed the accused to show a witness' character for truthfulness. *See Hurd v. State*, 725 S.W.2d 249, 252 (Tex. Crim.App.1987); *Harrison v. State*, 686 S.W.2d 220, 223 (Tex.App.—Houston [1st Dist.] 1984, pet. ref'd). Nevertheless, trial courts have considerable discretion as to how and when such impeachment will take place and as to what collateral evidence is material for that purpose. *See Hurd*, 725 S.W.2d at 252; *Green v. State*, 676 S.W.2d 359, 362–63 (Tex.Crim.App.1984).

Gladys testified that appellant started ninety percent of the fights, which leaves Gladys responsible for ten percent of the violence, by her own account. Mary was not present at every argument, and by her own testimony to the court, she witnessed "several" fights. After seeing less than all the fights between Gladys and appellant, it was Mary's opinion that Gladys provoked "a lot" of the trouble. Mary's broad statement was offered to impeach Gladys' broad statement regarding provocation; however, it failed to do so because even if every one of the "several" fights witnessed by Mary showed Gladys to be the aggressor, those "several" fights could have been amongst the ten percent Gladys already admitted to initiating. It is interesting to note that Mary testified that appellant was reluctant to fight with Gladys in front of his family. Thus, it would not be surprising that Gladys, not appellant, provoked the fights when Mary was present. So to Mary's eyes, Gladys provoked "a lot" of the fights.

This does not, however, account for all of the fights between Gladys and appellant. Thus, Mary's testimony would not have proved Gladys to be an untruthful person.

Appellant's underlying complaint appears to be that the jury would draw a possibly erroneous analogy from the first marriage to the second. The record reveals, however, that appellant himself admitted his unhappy first marriage, during which he had hit Gladys at times when drunk, but claimed it was only in response to Gladys' provocation. He described his unhappy first marriage to Gladys as being completely different from his second marriage to the deceased. The record also reveals that appellant called a number of witnesses to testify to the harmonious marriage he shared with deceased, and appellant's counsel vigorously argued these points in closing argument. Appellant was, therefore, able to convey to the jury and differences between his first and second marriages. We are not persuaded that Mary's far from disinterested testimony would have strengthened appellant's case in this regard. Thus, we conclude that the evidence, if offered for this purpose, was not of a character calculated to change the outcome of the case favorably to the accused. *Granviel v. State*, 552 S.W.2d 107, 122 (Tex.Crim.App.1976), *cert. denied*, 431 U.S. 933, 97 S.Ct. 2642, 53 L.Ed.2d 250 (1977).

We hold that the trial court did not abuse its discretion in limiting the testimony of Mary as a rebuttal witness. *See Hampton v. Hauck*, 383 F.2d 389, 390 (5th Cir. [Tex.] 1967) (the control of rebuttal testimony lies in the court's discretion). The court was willing to let Mary tell the jury of an incident where Gladys threw a baby bottle at appellant in an apparently unprovoked fit of rage. Other than that specific example, Mary offered no new information which the jury had not already heard. Gladys admitted to instigating some fights. Appellant and others had testified to the nature of his second marriage to the de-

---

**3.** Which individual provoked the arguments in that marriage was a collateral matter to appellant's defensive theory of accidently shooting

his second wife. *See, e.g., Flannery*, 676 S.W.2d at 370.

ceased, which is the distinction that appellant sought to describe for the jury. Further, Mary's testimony would not have impeached Gladys. We hold that the limitation of Mary's testimony did not contribute to the conviction of appellant in this case. Appellant's point of error is overruled, and the judgment is affirmed.