**John Charles SHIPPY aka Jon Frank Prewitt, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 53831.**

Court of Criminal Appeals of Texas.

April 27, 1977.

Rehearing Denied June 1, 1977.

Certiorari Denied Oct. 31, 1977.

See 98 S.Ct. 422.

Stephen E. Blythe, Edward S. Johnson, Temple, for appellant.

Joe Carroll, Dist. Atty., Belton, Bob D. Odom, Atty. Pro Tem. appointed on appeal, Killeen, Jim D. Vollers, State's Atty., and David S. McAngus, Asst. State's Atty., Austin, for the State.

## OPINION

ODOM, Judge.

Appellant was convicted for capital murder. The trial court assessed his punishment at death after the jury affirmatively answered the issues submitted to them at the punishment phase of the trial. Article 37.071, V.A.C.C.P.

The record reflects that the deceased returned from work to his home where he discovered appellant in the act of burglary and theft. Appellant seized a long-bladed hunting knife and stabbed his victim a total of twenty-seven times, fatally wounding him. Appellant then took the money from the deceased's wallet and fled.

Appellant raises nineteen grounds of error. We have grouped these into six general areas and will dispose of them in the following order: (1) denials of requested jury instructions; (2) challenges to the jury selection process; (3) complaints to the admission of evidence; (4) challenges to the sufficiency of the evidence on particular points; (5) complaints of prosecutorial jury arguments; and (6) attacks on the constitutionality of Art. 37.071, V.A.C.C.P.

## JURY INSTRUCTION ISSUES

Appellant contends the trial court erroneously refused, after a timely request, to submit a charge on circumstantial evidence with regard to the issue of whether there was a probability he would commit future acts of violence constituting a continuing threat to society. (Issue number two of Art. 37.071, supra.) He argues that there can be no direct evidence on this issue since it pertains to the probability of a future act occurring, and therefore, he was entitled to a circumstantial evidence charge on this issue.

This is a question of first impression, and one of difficult determination. Some light may be cast on the subject by examining the rule that has required such a charge, or dispensed with the requirement, in other situations.

Judge Graves writing in *Stocks v. State*, 147 Tex.Cr.R. 164, 179 S.W.2d 305, at 308, reviewed statements of the rule in earlier cases:

"We early said in the case of *Beason v. State*, 43 Tex.Cr.R. 442, 67 S.W. 96, 98, 69 L.R.A. 193: 'The rule is this: That it is only necessary where the main fact, or as one case puts it, *"where the gravamen of the offense,"* or, as another case has it, *"where the act of the crime,"* rests solely upon circumstantial evidence, that then it becomes a case known as a case of circumstantial evidence requiring a charge upon that. In the *Buntain* case, [*Buntain v. State*], 15 Tex.App. 515, Judge White used the following language: "If a court were required to charge the law of circumstantial evidence in all cases where reliance was had upon circumstances to establish any particular fact, then, indeed, there would be but few, if any, cases in which such a charge would not be required; but such is not the rule. A charge upon circumstantial evidence is only required when the evidence of *the main facts essential to guilt* is purely and entirely circumstantial."'

"Again, in *Hanks v. State*, Tex.Cr.App., 56 S.W. 922, we have said that: 'We are

aware of the rule, and we adhere to the same, that when the main fact constituting the gravamen of the offense is proved by direct testimony, and the intent merely with which the act was done is proven by circumstantial evidence, a charge on circumstantial evidence will not be absolutely necessary.'

"Again, if the intent alone is determined by circumstances, such would not render the case as one depending upon circumstantial evidence. *Jones v. State*, 34 Tex.Cr.R. 490, 492, 31 S.W. 664." (Emphasis added.)

The rule does not require a circumstantial evidence charge simply because intent is only shown circumstantially,[1] and this rule has been reaffirmed in recent cases. *Green v. State*, Tex.Cr.App., 533 S.W.2d 769; *Davis v. State*, 516 S.W.2d 157; *Sloan v. State*, 515 S.W.2d 913.

■ The rule, then, does not require a circumstantial evidence charge on every facet of the case that is only supported by circumstantial evidence. Of what significance is this observation in the present context?

First, issues at the punishment stage are not submitted to establish "the gravamen of the offense," or "the act of the crime," or "the main facts essential to guilt." Guilt has already been established when this stage of the proceedings is reached. In this respect the issue on which a circumstantial evidence charge was sought in this case is even further outside the scope of the established rule than is the issue of intent. By analogy we may say the established rule does not require a circumstantial evidence charge on the issue.

■ Second, inasmuch as the established rule appears to strike a distinction between proof of the culpable act (a matter of objective historical fact) and proof of mens rea (a matter of psychological fact), and requires a circumstantial evidence charge only on circumstantial proof of the former,[2] proof of the second issue of Art. 37.071, supra, by circumstantial evidence would not appear to require a circumstantial evidence charge, the issue being one of a psychological fact rather than objective historical fact. The judgment the jury is called upon to make in answering this issue is one that by its very nature may only be made upon consideration of numerous and various circumstances that are incapable of reduction to an exhaustive, comprehensive list. This very character of the issue led the United States Supreme Court in *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929, to uphold the Texas statutory scheme because this issue so construed affords the defendant found guilty of capital murder the opportunity to present mitigating circumstances to the jury at the punishment stage. That Court further described this issue thusly:

"Focusing on the second statutory question that Texas requires a jury to answer in considering whether to impose a death sentence, the petitioner argues that it is impossible to predict future behavior and that the question is so vague as to be meaningless. It is, of course, not easy to predict future behavior. The fact that such a determination is difficult, however, does not mean that it cannot be made. Indeed, prediction of future criminal conduct is an essential element in many of the decisions rendered throughout our criminal justice system. The decision whether to admit a defendant to bail, for instance, must of-

1. Nevertheless, where intent is itself the gravamen of the offense, a circumstantial evidence charge may be required, as in *Nichols v. State*, 39 Tex.Cr.R. 80, 44 S.W. 1091; *Haney v. State*, Tex.Cr.App., 438 S.W.2d 580; and *Armstrong v. State*, Tex.Cr.App., 542 S.W.2d 119.

2. This we find notwithstanding *Nichols v. State* and *Haney v. State, supra*, which acknowledged that a circumstantial evidence charge may be required in a forgery by passing case

on the issue of knowledge that the instrument is forged. Proof of such knowledge in that context may be by historical fact in that such knowledge is acquired and evidenced by historical events, as contrasted to intent or knowledge that arises from internal psychological processes. The same observations are valid with respect to proof of knowledge in cases where knowing possession is the gravamen of the offense. See *Armstrong v. State, supra*.

ten turn on a judge's prediction of the defendant's future conduct. And any sentencing authority must predict a convicted person's probable future conduct when it engages in the process of determining what punishment to impose. For those sentenced to prison, these same predictions must be made by parole authorities. The task that a Texas jury must perform in answering the statutory question in issue is thus basically no different from the task performed countless times each day throughout the American system of criminal justice. What is essential is that the jury have before it all possible relevant information about the individual defendant whose fate it must determine. Texas law clearly assures that all such evidence will be adduced." (Footnotes omitted.) 428 U.S., at 274, 96 S.Ct., at 2957.

For these reasons we conclude that issue number two of Art. 37.071, supra, is an issue that does not fall within the rule that dictates use of the circumstantial evidence charge. The ground of error is overruled.

■ Appellant also contends that the trial court improperly denied his request to instruct the jury at the punishment stage of the trial that one act of capital murder does not establish a pattern of behavior from which can be inferred a probability that the appellant would commit future criminal acts of violence constituting a continuing threat to society.

Such a charge would have constituted an improper comment on the weight of the evidence and was properly denied. This ground of error is also overruled.

## JURY SELECTION ISSUES

Two grounds of error raise jury selection issues.

First, appellant contends that the prohibitions of *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776, were violated when the trial court sustained the State's challenge for cause to prospective jurors J. C. Barton and Mrs. Jimmy L. Conner.

■ We overrule the contention regarding Barton because no objection was voiced to the exclusion of this prospective juror. *Boulware v. State*, Tex.Cr.App., 542 S.W.2d 677, at 683, states:

". . . we hold that the failure to object to the improper exclusion of a venire member waives that right and it cannot be considered on appeal."

An exception to the exclusion for cause of Mrs. Conner was voiced. She, however, stated that she could not take the oath provided by V.T.C.A., Penal Code Sec. 12.-31(b).[3]

■ In *Moore v. State*, Tex.Cr.App., 542 S.W.2d 664, we held that the inability to take the oath required by this statute disqualifies the prospective juror and *Witherspoon* considerations are unnecessary. Mrs. Conner was properly excused.

The second complaint of improper jury selection process alleges that the requirements of Art. 34.04, V.A.C.C.P.[4] were vio-

3. Section 12.31(b) provides: "Prospective jurors shall be informed that a sentence of life imprisonment or death is mandatory on conviction of a capital felony. A prospective juror shall be disqualified from serving as a juror unless he states under oath that the mandatory penalty of death or imprisonment for life will not affect his deliberation on any issue of fact."

4. Article 34.04 provides: "No defendant in a capital case shall be brought to trial until he shall have had at least two days (including holidays) a copy of the names of the persons summoned as veniremen, for the week for which his case is set for trial except where he waives the right or is on bail. When such defendant is on bail, the clerk of the court in which the case is pending shall furnish such a list to the defendant or his counsel at least two days prior to the trial (including holidays) upon timely motion by the defendant or his counsel therefor at the office of such clerk, and the defendant shall not be brought to trial until such list has been furnished defendant or his counsel for at least two days (including holidays). Where the venire is exhausted, by challenges or otherwise, and additional names are drawn, the defendant shall not be entitled to two days service of the names additionally drawn, but the clerk shall compile a list of such names promptly after they are drawn and if the defendant is not on bail, the sheriff shall serve a copy of such list promptly upon the defend-

lated by the trial court. During the voir dire, the appellant notified the court that one of the veniremen had been called out of order. The trial court replied that one of the prospective jurors had been summoned but had established a reason that he deemed sufficient for her excuse pursuant to Art. 35.03, V.A.C.C.P.[5] This excuse was given under oath.

■ Article 34.04, supra, was allegedly violated because the trial court denied appellant's motion requesting a recess in the proceeding until the attendance of the excused venireman could be secured. It is also urged that error was committed by the trial court's failure, after timely motion, to have the State exercise a peremptory challenge against the excused venireman. Finally, it is contended that the trial court should have granted the motion for mistrial entered at this stage in the jury selection process.

Initially, we observe that appellant has not challenged the sufficiency of the sworn excuse given by the prospective juror to the trial judge.

A violation of Art. 34.04, supra, is not presented by the record. Appellant never states that he was denied the procedure outlined by this statute. Rather, he asserts that its provisions have been violated because the trial court excused a juror for a reason given under oath as provided for in Art. 35.03, supra.

■ We perceive no error in the action of the trial court. The action requested was unnecessary and would have delayed the formulation of the jury. Article 34.04, supra. This ground of error is overruled.[6]

### EVIDENTIARY ISSUES

Various complaints concerning the admission of certain exhibits and testimony have been raised by this appeal.

Objection was made to the introduction of eight exhibits by the State. These items were seized at the residence of Rebecca Casey Kubala and they connected appellant with the offense. Kubala executed a written consent to this search. It is argued, however, that Kubala's consent to the search was involuntary and coerced because she was informed by the police that a search warrant would be obtained if she did not sign the consent form. We are also presented with the claims that Kubala was under duress because she was surrounded by an "army of police" and that the police began searching the apartment before she signed the consent form.

Kubala testified at the suppression hearing that her consent was given voluntarily and that no threats or promises had been made. She stated that she told the police they could search her apartment before she left the police station. In other words, oral consent to the search was given before she signed the consent form. Kubala also described the police as being "nice" to her.

■ The allegations of coercion and duress are not supported by the record. Kubala did state that she thought the police had a search warrant at the time she signed the consent form and that she was told the police would obtain a warrant if she did not consent to the search. This, however, does

---

ant, and if on bail, the clerk shall furnish a copy of such list to the defendant or his counsel upon request, but the proceedings shall not be delayed thereby."

5. Article 35.03 provides: "The court shall then hear and determine excuses offered for not serving as a juror, and if he deems the excuse sufficient, he shall discharge the juror."

6. Article 35.20, V.A.C.C.P., provides that the names of the prospective jurors shall be called in the order in which they appear upon the list furnished the defendant. It also provides that a person who has been summoned but who is not present may be tried as to his qualifications

and impaneled as a juror before the jury is completed, but no cause shall be unreasonably delayed on account of such absence. We also note that Art. 35.20, supra, specifically provides that no cause shall be unreasonably delayed on account of the absence of a summoned venireman. This, coupled with the fact that the absent venireman in this case was properly excused, supports our conclusion that no error was committed by the trial court. We also reiterate our position that the "conduct of the voir dire examination must rest largely within the sound discretion of the trial court." *Moore v. State, supra.*

not compel us to conclude that the consent was unlawfully obtained. *Resendez v. State*, Tex.Cr.App., 523 S.W.2d 700; *Stephenson v. State*, Tex.Cr.App., 494 S.W.2d 900.

Kubala's consent to the search of her apartment was voluntary. The evidence seized was properly admitted. *Swift v. State*, Tex.Cr.App., 509 S.W.2d 586; *Maldonado v. State*, Tex.Cr.App., 397 S.W.2d 862.

Appellant insists that his confession was improperly admitted into evidence. He argues that the confession was obtained only after he was confronted with evidence illegally seized in the search of Kubala's residence. These exhibits, under our holding above, were not seized unlawfully. The confession, therefore, was not "tainted" and was properly admitted into evidence. *Morrison v. State*, Tex.Cr.App., 508 S.W.2d 827.

We must determine whether error was committed by the admission into evidence of the knife used to kill the deceased: Appellant maintains that the weapon was recovered only after he was confronted with illegally seized evidence. The "illegally" seized evidence, once again, consists of those items discovered in Kubala's apartment. The murder weapon was found as a result of the confession and it too was properly admitted into evidence.

█ The admission of two photographic exhibits of the deceased is challenged. It is urged that this evidence was cumulative, depicting the same evidence shown in two previously admitted photographic exhibits, and that its probative value was far outweighed by its inflammatory and prejudicial aspects.

Prior to the admission of the complained of evidence, the other exhibits were properly introduced into evidence. These photographs depicted a frontal view of the deceased. The deceased's chest and abdomen areas were covered by a shirt in these pictures.

Later, Officer T. W. Jackson testified and identified two exhibits as being fair and accurate representations of the victim's chest and facial features on the date of the offense. One is a close-up of the victim's bare chest and abdomen. It shows the placement and number of stab wounds inflicted by the appellant. The other is a close-up of the deceased's head. It shows a scalp wound.

Hence the record shows that these photographs are not cumulative. Neither are they unduly inflammatory and prejudicial. The trial court did not abuse its discretion. *Harrington v. State*, Tex.Cr.App., 547 S.W.2d 621 (1977); *Fazzino v. State*, Tex.Cr.App., 531 S.W.2d 818; *Martin v. State*, Tex.Cr.App., 475 S.W.2d 265. The admission of the complained of photographs was not error.

Finally, the admission of the testimony of Dr. Richard Gaines, a psychiatrist, during the punishment stage of the trial is contested. Dr. Gaines was called by the State to give his opinion on the probability of appellant committing criminal acts of violence in the future that would constitute a continuing threat to society. Article 37.071, V.A.C.C.P.

Appellant was originally indicted for capital murder in trial cause no. 23,026. During proceedings under this cause number, appellant's counsel requested the court to appoint a psychiatrist to determine whether the appellant was sane or insane at the time the offense was committed and to ascertain if he was competent to stand trial. Article 46.02, V.A.C.C.P.[7] The court granted this motion and ordered Dr. Gaines to conduct an examination of appellant.

Dr. Gaines examined the appellant, met with appellant's counsel, and gathered personal and background information concerning the appellant. Dr. Gaines was also assisted by another person who administered psychological tests.

After the examination, interviews and testing, Dr. Gaines met with appellant and his counsel. Appellant concluded that Dr. Gaines would not be called as a witness by the defense.

---

7. Appointment was prior to the effective date of the 1975 amendment to this statute.

Subsequent to the appointment of the psychiatrist, the appellant's motion to quash the indictment in cause no. 23,026 was granted. Appellant was then reindicted for capital murder in trial cause no. 23,781, and his present appeal comes from the conviction obtained thereon. No psychiatric examinations were conducted during the proceedings held under the new cause number.

Dr. Gaines was subpoenaed by the State to testify during the punishment stage of the trial. His testimony concerning appellant's propensity to commit future acts of violence was adverse to the defense. Dr. Gaines also testified that he could not have reached his opinions and conclusions with regard to the appellant's propensity to commit future acts of violence if the appellant and his counsel had not provided him with information.

Appellant contends the admission of Dr. Gaines' testimony violated: his Fifth Amendment right against self-incrimination; his Sixth Amendment right to effective counsel; the attorney-client privilege and the "work product" doctrine; Articles 46.02(3)(f), 39.14, and 28.05, V.A.C.C.P.; and the Equal Protection Clause of the Fourteenth Amendment. We shall consider each of these allegations.

■■■ Appellant's right against self-incrimination guaranteed by the Texas and Federal Constitutions was not violated. *Livingston v. State,* Tex.Cr.App., 542 S.W.2d 655. There is nothing in the record to establish that this witness "revealed any fact or communication between him and the appellant showing that appellant committed a crime of any nature." *Granviel v. State,* Tex.Cr.App., 552 S.W.2d 107 (1976).

■■■ Appellant argues that his right to effective assistance of counsel demands that expert psychiatric assistance be made available to his counsel in order to assure that every possible means of defense will be explored. In other words, defense counsel must be provided psychiatric assistance in order to ascertain if he was insane at the time the offense was committed.

According to appellant, this psychiatrist should not be allowed to testify in a manner adverse to the accused at the punishment stage of the trial. To allow the psychiatrist to enter adverse testimony would render counsel ineffective because such evidence was gathered at the behest of the accused's attorney. In short, the counsel's effective representation in seeking psychiatric evidence in order to determine the accused's sanity would later be rendered ineffective by the physician's adverse testimony on punishment.

Accepting appellant's position on this issue would amount to a retreat from our decisions in *Granviel v. State, supra; Moore v. State, supra; Livingston v. State, supra;* and *Gholson v. State,* Tex.Cr.App., 542 S.W.2d 395. This we decline to do. Also see, *Stultz v. State,* Tex.Cr.App., 500 S.W.2d 853.

Appellant has not been denied effective assistance of counsel.

■■■ Appellant also contends that the attorney-client privilege and the "work product" doctrine were violated when Dr. Gaines testified at the punishment stage of the trial. Article 46.02, supra, provides that a psychiatrist can be appointed to examine a defendant on the motion of the court, the defense counsel or the prosecutor. The psychiatrist so appointed is a disinterested witness; his examination, conclusions, and opinions do not constitute the "work product" of the State or the defense and either party may subpoena this physician. *Granviel v. State, supra.*

■■■ Likewise, Article 46.02(3)(f), supra, has not been violated by the introduction of testimony from Dr. Gaines. This statute provides that the statements made by an accused during the examination or hearing on his competency to stand trial may not be admitted against him on the issue of guilt. Dr. Gaines' testimony was admitted at the punishment stage of the trial, and, furthermore, none of appellant's statements were introduced into evidence. *Granviel v. State, supra.*

Appellant's claim in regard to Art. 39.14, supra, has no validity. This statute con-

cerns discovery of material in the possession of the State.

Article 28.05, supra, governs procedure after a felony indictment is quashed. It reads:

"If the motion to set aside or the exception to the indictment in cases of felony be sustained, the defendant shall not therefore be discharged, but may immediately be recommitted by order of the court, upon motion of the State's attorney or without motion; and proceedings may afterward be had against him as if no prosecution had ever been commenced."

■ Appellant argues that this statute renders Dr. Gaines' testimony invalid for all purposes because the psychiatric examination was conducted prior to the sustaining of the motion to quash the indictment in trial cause no. 23,026. His theory is that Dr. Gaines' opinions were formulated in the prior cause no. 23,026, and cannot be used in this case, no. 23,781, because the new cause must proceed "as if no prosecution had ever been commenced." Article 28.05, supra.

■ This is a novel, but unpersuasive theory. Article 28.05, supra, does not control what evidence may be presented at the punishment stage of a capital murder trial. See, Art. 37.071, supra. We overrule this contention.

■ The final argument asserts violation of the Equal Protection Clause of the Fourteenth Amendment. Appellant argues that he, as an indigent defendant, does not have the funds to retain a private psychiatrist to examine him for purposes of a competency determination. If he had such funds, he could employ physicians to examine him and he would not have to disclose their names to the State. In this manner, the State would not be able to ascertain the name of a psychiatrist that it could later subpoena to testify against the appellant at the punishment stage of the trial.

Article 46.02, supra, outlines a procedure to be followed when a question concerning the accused's competency to stand trial is raised. Appellant's argument does not negate the fact that Art. 46.02, supra, may be utilized whether the accused is wealthy or poor. The State may request or the court on its own motion may order a psychiatrist to examine the accused. This psychiatrist may later testify pursuant to Art. 37.071, supra, at the punishment stage of the trial, if his testimony is relevant. It should be noted that the physician's testimony can also be advantageous to the accused. See *Robinson v. State*, Tex.Cr.App., 548 S.W.2d 63 (1977).

Furthermore, if the State discovers the rich defendant's psychiatrists, they may be subpoenaed to testify at the punishment stage of the trial because Texas does not recognize a doctor-patient evidentiary privilege. *Granviel v. State, supra.*

We perceive no violation of the Equal Protection Clause of the Fourteenth Amendment. It was not error to admit Dr. Gaines' testimony.

## SUFFICIENCY OF THE EVIDENCE ISSUES

Appellant raises two grounds of error regarding the sufficiency of the evidence, one directed to proof of an element of the offense, and the other directed to proof of one of the punishment issues.

Challenge is raised to the sufficiency of the evidence to show this murder was committed in the course of robbery as alleged in the indictment under V.T.C.A., Penal Code Sec. 19.03(a)(2).

Appellant's confession shows burglary of the deceased's home followed by theft of numerous items including coins of the United States. The deceased then arrived and appellant stabbed him to death. He then removed the deceased's wallet and stole the money in it.

V.T.C.A., Penal Code Sec. 29.02 defines robbery in part as follows:

"A person commits an offense if, in the course of committing theft as defined in Chapter 31 of this code *and with intent to obtain or maintain control of the property,* he:

"(1) intentionally, knowingly, or recklessly causes bodily injury to another; . . . " (Emphasis added.)

Appellant's attack appears to be centered on the emphasized language. The indictment alleged the property to be "good and lawful U.S. Currency." Appellant asserts (1) the coins taken before the killing are not currency and (2) at the time of the killing there was no intent "to obtain or maintain control of the property" taken from deceased's wallet. By its own terms, appellant's two-pronged attack is viable only if both assertions are valid.

In *Casias v. State*, Tex.Cr.App., 452 S.W.2d 483, it was held that coins are currency. Accordingly, the first prong of appellant's attack is not valid, and the ground of error is without merit.

Another ground of error challenges the sufficiency of the evidence to prove that there is a probability appellant will commit criminal acts of violence constituting a continuing threat to society. Article 37.071, supra. We do not agree.

At the punishment stage of the trial, the State elicited evidence from Officer Vernon McKenzie and Chief Leonard Hancock of the Temple Police Department and Dr. Richard Gaines. The two policemen testified that the appellant's reputation in the community for being a peaceable and law-abiding citizen was bad.

Dr. Gaines testified that the appellant had a potential for committing criminal acts of violence and that he would be more likely than the average person to engage in acts of violence in society. The doctor also stated that the appellant would be a multiple number of times more likely than the average person to engage in future acts of violence.

The doctor did, however, testify that he could not state that there was a "reasonable medical probability" that the appellant would commit future acts of violence.

The jury was also permitted to consider all of the evidence presented at the guilt stage, including appellant's confession admitting the offenses of theft of a motor vehicle, burglary of a habitation, theft of personal property, and aggravated robbery. This evidence also established that the appellant stabbed the deceased twenty-seven times with a hunting knife.

The testimony of the two police officers and Dr. Gaines when coupled with the rest of the evidence presented at trial is sufficient to support the jury's conclusion that there was a probability appellant would commit future acts of violence constituting a continuing threat to society. We overrule the ground of error.

## JURY ARGUMENT ISSUES

Three grounds of error complain of jury arguments by the prosecutor.

It is first asserted that the trial court should have declared a mistrial after the prosecutor, during jury argument, stated that it was a reasonable deduction from the evidence that: "The lust for blood is what overcame John Charles Shippy."

The trial court sustained appellant's objection and promptly instructed the jury to disregard the statement. A motion for mistrial was denied.

The court's action cured any harm caused by the argument. *Curtis v. State*, Tex.Cr.App., 519 S.W.2d 883; *Pringle v. State*, Tex.Cr.App., 511 S.W.2d 35. We overrule this ground of error.

It is also contended that the prosecutor misstated the law in his jury argument during the punishment stage of the trial, and that the argument was prejudicial and calculated to mislead the jury.

The complained of statements consist of two segments of the jury argument:

"What we are really talking about in this stage of the trial, ladies and gentlemen, is deterence. We need to have deterence. You know what I mean by deterence. That means if you punish one man for a crime maybe someone else down the line who has it in his head to commit the same kind of crime might stop and think. I mean, he may be thinking about going into this house over here

and he says, well, I can probably rip off some property pretty easily, probably steal some stuff, you know, and give (sic) me some money, but wait a minute, John Charles Shippy did that and he killed a man in the process."

"Why else would he stab the man to death unless it is just that he didn't want to leave a witness. If we don't stop people who do that they will never leave a witness, I mean, you have got a chance of getting caught if there is a witness there, but if you leave that witness dead there is much less chance of your getting caught. Only this time due to excellent police work and citizen participation this man was caught, and we have got to deter other people who might commit burglary, robberies, whatever crimes, and decide that they will kill their witness so they won't leave anyone to point their finger at them."

We perceive no misstatement of law in this argument. The prosecutor's statements amount to a plea for law enforcement and they are not improper. *Alejandro v. State*, Tex.Cr.App., 493 S.W.2d 230. We also observe that this argument was not outside the record. Appellant's confession and other evidence established that he committed the crimes of burglary, robbery and murder on the night of the offense. This ground of error is overruled.

Finally, appellant asserts his motion for mistrial should have been granted when the prosecutor argued at the punishment stage of the trial:

"I can't help but wonder what Dr. Gaines might have said about John Charles Shippy on April 16, 1975, if he had seen him. We can presume since it was based on some analysis and visiting with him very possibly he would have said the man is possibly a violent person, that he is a multitude times greater risk than the ordinary person. Might have been the same, but would he have probably committed criminal acts of violence. He did. He sure did. What would the opinion have been on that date, the day before this atrocity was committed."

■ Objection to this argument was sustained and the jury was instructed to disregard the statements. We conclude that the court's action cured the effect of these improper statements. *Curtis v. State, supra; Pringle v. State, supra.* The ground of error is overruled.

## CONSTITUTIONALITY OF ART. 37.071, V.A.C.C.P.

Appellant's last five grounds of error attack the constitutionality of Art. 37.071, V.A.C.C.P. on various grounds. These have previously been considered by this Court, and the constitutional validity of the statute has been pronounced by the United States Supreme Court in *Jurek v. Texas, supra.* The grounds of error are overruled.

The judgment is affirmed.

ROBERTS, Judge, dissenting.

### I.

The appellant initially contends that the trial court erred in sustaining the State's challenge for cause to two prospective jurors in that such action violated the mandate of *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). I would sustain this contention and reverse.

The pertinent part of the voir dire examination of prospective juror Barton is as follows:

"[PROSECUTOR]: . . . because of that, I need to ask you first of all, do you have any moral, religious, or conscientious scruples against the infliction of the death penalty?

"[BARTON]: Yes, sir, in a way I do.

"[PROSECUTOR]: All right, sir. Are those based upon religious or moral grounds?

"[BARTON]: Religion, yes, sir.

"[PROSECUTOR]: Now, let me comment at this point. There are no right or wrong answers here, and we know that a lot of people feel that way, and we respect the way that you feel. We want you to tell us the way you feel because that is what we

are getting to. Let me ask you if these religious convictions that you have, are they pretty long-standing and deep-seated?

"[BARTON]: No, sir. Just like I say, I just don't think a man—I just don't believe that I can judge another man. I believe that should be left up to the good Lord.

"[PROSECUTOR]: Are those feelings and religious convictions such that it would prevent you from answering these three questions yes regardless of the evidence if you knew that the judge would have to send this man down to die in the electric chair?

"[BARTON]: Yes, sir, it would bother me. I would say that it would.

"[PROSECUTOR]: And so, you feel that regardless—and once again, we want you to know that we respect what you are saying. We understand, but regardless of what the evidence is in the case of this nature, you feel like that you just couldn't send this man down to die in the electric chair. You just couldn't answer these questions yes regardless of the evidence?

"[BARTON]: I don't believe I could, sir.

"[PROSECUTOR]: Cause, Your Honor.

"THE COURT: Do you have any questions?

"[DEFENSE COUNSEL]: . . . Based upon your religious beliefs, are you stating unequivocally that you could never participate in a jury function in such a manner that from your verdict, or from answering those questions that a man could be sentenced to die?

"[BARTON]: No, sir.

"[DEFENSE COUNSEL]: You never could do so?

"[BARTON]: No, sir, I don't think so.

"[DEFENSE COUNSEL]: You say you don't think so. You either can or can't, Mr. Barton.

"[BARTON]: I don't think I can. Let me just give you my—even when I was in combat, I never could get like—I remember the first time I tried to pull the trigger on killing a man. I just—it is just something that I can't see a man killing another man.

"[DEFENSE COUNSEL]: All right, sir. Thank you very much.

"THE COURT: Mr. Barton, we appreciate your honesty, . . . .

\*    \*    \*    \*    \*    \*

"THE COURT: . . . You are excused." [1]

1. Prospective juror Barton was also voir dired as follows:

"[PROSECUTOR]: . . . My question is, if we do that—if we satisfy you that he is guilty beyond a reasonable doubt, could you find him guilty of capital murder?

"[BARTON]: I believe so, sir.

"[PROSECUTOR]: Well, you're going to have to take an oath to follow the law, and in the court's charge—I believe the charge will say that if you are satisfied that you must do that, and once again, the reason that I reasked this question is that your answer was somewhat hesitant. Would there by any problem that you might have with that?

"[BARTON]: No, sir.

"[PROSECUTOR]: All right, good. We have in this State what is called the bifurcated trial system and that is a lawyer's word we all try to use these big words whenever we can. What that really means is that each trial is divided into two stages. At the first part of the trial we are only concerned with whether or not the defendant is guilty or innocent of capital murder. If and when the jury finds him guilty of capital murder, then we will go into the second part of the trial which deals with only the punishment. In the first part you are not concerned with the punishment. Do you follow me on that?

"[BARTON]: (Nods head)

"[PROSECUTOR]: You have two separate trials really.

"[BARTON]: Yes, sir.

"[PROSECUTOR]: You only become concerned with the punishment to be assessed at the second part of the trial. I assume that you realize from the definition, or the name of this offense, capital murder, that if we prove to you and the other members of the jury that the defendant committed capital murder, and you find him guilty of capital murder, which you must do if we satisfy you under the burden of proof, that if we get to punishment, there are only two possible punishments. The death penalty and life imprisonment. I want to be honest with you. I want to be straightforward with you. And, tell you that because of what we believe the facts are going to be in this case, we, who

It must be determined "whether the requisites of *Witherspoon* have been met . . . ." *Hovila v. State*, 532 S.W.2d 293, 294 (Tex.Cr.App.1975). In *Witherspoon*, it was stated that "Unless a venireman states unambiguously that he would automatically vote against the imposition of capital punishment no matter what the trial might reveal, it simply cannot be assumed that that is his position." *Id.*, 391 U.S. at 516, n. 9, 88 S.Ct. at 1774.

I cannot equate prospective juror Barton's answers with an unambiguous statement that he would automatically vote against the death penalty in every case. It was not made "unmistakably clear . . that [he] would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before [him] . . . ." (Emphasis included). *Id.*, at 522, n. 21, 88 S.Ct. at 1777. Nor did he appear to be "irrevocably committed, before the trial [began], to vote against the

penalty of death regardless of the facts and circumstances that might emerge in the course of the proceedings." *Id.*

The specific holding of *Witherspoon* was " . . . that a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction. No defendant can constitutionally be put to death at the hands of a tribunal so selected." *Id.*, at 522–523, 88 S.Ct. at 1777.

The "irrevocable commitment" to vote against the death penalty no matter what the evidence might show is the only basis for a constitutionally valid disqualification under *Witherspoon*. Anything short of this must be viewed in the light of the specific holding in that case.

represent the people of Texas, intend to ask the jury to assess the punishment—let me say this: to answer some questions in such a way that the death penalty will result. I want to impress upon you now that that is what we feel will be the just and proper punishment in this case, and this is the punishment that we will be seeking. That is the death penalty. Now, under our old procedure, if the jury wanted to give death, they would go in and write out, we, the jury, sentence the defendant to death in the electric chair. We don't do that anymore. Under our new system, there are three questions that the jury is given to answer, and the State has the burden of proof, and we must prove beyond a reasonable doubt based upon the evidence in stages of the trial that these questions should be answered yes. If the jury answers these questions yes, then the judge has no choice but to assess capital punishment. Do you follow me on that?
"[BARTON]: Yes, sir.
"[PROSECUTOR]: Your Honor, I have just had these three questions typed out, and in the interest of time, I would like to leave them up here so that the jurors could examine them, and I have a copy here if they would like to have them. They are directly out of the statutes.
"[PROSECUTOR]: If you would, would you look over those three questions for me, sir? All right. Have you taken a look at them for me, sir?
"[BARTON]: Yes, sir.

"[PROSECUTOR]: As I say, the State must prove to the jury that each of these should be answered yes. If they are answered yes, it becomes incumbent upon the judge to assess the death penalty. If any one of those questions is answered no at the punishment stage of the trial, then the punishment will be life imprisonment. Any no answer means life imprisonment. Now, you will be hearing, and very properly so, and we will talk to you some about it in all probability, and certainly the defense counsel will, about the rights of the defendant to a fair trial, and certainly no one here wants him to have a fairer trial than we do. We respect the rights of individuals in this country to such a trial, and we intend to see that Mr. Shippy has one. I make this remark because I don't want to talk to you a minute about something we don't hear about in the public too much and the press, whatever, and that is that the people that we represent—you don't see a client seated at our table, but the people that we represent are the people of Texas, and they have a right to a fair trial also, and one of the rights in a case of this nature is the fact that we have the right to have people to serve on the jury in a capital case who have thought about and made up their minds and know how they feel about the death penalty. And, because of that, I need to ask you first of all, do you have any moral, religious, or conscientious scruples against the infliction of the death penalty?
"[BARTON]: Yes, sir, in a way I do."

The pertinent part of the voir dire examination of prospective juror Conner is as follows:

"[PROSECUTOR]: Well, that is what is going to happen. That is what the sentence will be. You know, I hate to keep pressing it, but I need to know. Even though you don't see a client here, we represent the people of the State of Texas, and those people have a right to jurors who know how they feel about the death penalty, and who can and will answer those questions yes, if that is the way the evidence indicates they ought to be answered beyond a reasonable doubt, and let the chips fall where they may. And, I am assuming from your answer that you couldn't state under oath that you could do that?

"[CONNER]: It sure would be hard.

"[PROSECUTOR]: Now, Mrs. Conner, if you were selected to serve on this jury, there is a very real possibility that you would be faced with that exact question, as to whether or not you could answer the questions according to the evidence and let the chips fall where they may on the punishment. Now, the State and the defendant both have the right to have jurors who know that they can do that, and, of course, I am sure you wouldn't want to, and certainly we wouldn't want to deprive either party of the right to have jurors who can give a fair consideration to the evidence and answer the questions based on the evidence, and if that evidence says yes beyond a reasonable doubt, can answer them yes, and regardless of the fact that the de-

fendant is going to be sent down to die in the electric chair. I need a definite answer. Do you feel like that you could or you couldn't do that?

"[CONNER]: Well, sir, I'm just going to go ahead and tell you no. I don't feel like I can do that. I just sort of have mixed emotions about it. Instead of just telling you yes, I think I could do it, I would rather tell you no, I couldn't do it.

"[PROSECUTOR]: Let me explain it to you this way. You would have to state under oath not that you didn't know whether or not these feelings you have will affect your deliberations, on the question of fact, but you have got to state absolutely no, they would not affect your deliberations on a question of fact. I take it from your answers that you couldn't take that oath and say absolutely that the mandatory imposition of the death penalty or life imprisonment would not affect your deliberations on a question of fact. You could not say that, is that correct?

"[CONNER]: That is correct.

"[PROSECUTOR]: For cause, Your Honor.

"THE COURT: Any questions?

"[DEFENSE COUNSEL]: We will pass the juror, Your Honor.

"THE COURT: You have no questions?

"[DEFENSE COUNSEL]: No, sir.

"THE COURT: . . . You will be free to go.

"[DEFENSE COUNSEL]: Your Honor, note our exception, please, sir."[2]

**2.** Prospective juror Conner was also voir dired as follows:

"[PROSECUTOR]: . . . and my first question along this line, if we prove to you beyond a reasonable doubt to your satisfaction that the defendant was guilty of capital murder, would you find him guilty?

"[CONNER]: Yes. Let me ask you this.

"[PROSECUTOR]: Okay.

"[CONNER]: Is it the jury's duty then to say, okay, we think maybe he's guilty, or we think

he is not. Who actually sentences him, us, or the judge?

"[PROSECUTOR]: All right. Let me get into punishment then because apparently you have some feelings about the death penalty?

"[CONNER]: Yes, sir.

"[PROSECUTOR]: All right. If, as I say, if we prove him guilty, the jury must find him guilty, if we prove it beyond a reasonable doubt.

"[CONNER]: Yes, sir.

"[PROSECUTOR]: If that happens, we go into the punishment phase of the trial, and in a capital murder case, there is not but two possible punishments, death by electri cution in the electric chair, or life imprisonment. There is no range. It is one of the two.

"[CONNER]: Yes, sir.

"[PROSECUTOR]: Now, the jury no longer sits down and writes out, we, the jury, give the defendant death. You know, like they used to, but in a very real sense, the jury determines what the judge has go_ to do, because you will be given three questions, and if all three of these questions are answered yes, the judge has no alternative, he is absolutely required to sentence the defendant to be taken to Huntsville and put to death in the electric chair. Now, the State has the burden of proof on these questions. And we must prove to the jury beyond a reasonable doubt that these questions should be answered yes. Just like at the guilt or innocence stage, if we do that, the people of this State are entitled to twelve jurors who will answer them yes, even though you know that down the line, and there is no question about it, absolutely, the defendant will receive the death sentence. So, you see what we are concerned about here. We have got to have twelve jurors because we represent the people of the State, who could and would answer these questions yes, if we prove they ought to be beyond a reasonable doubt, even though it meant the death sentence. Have I made that clear?

"[CONNER]: Yes, sir, I was just thinking as far as me giving the electric chair, I don't know if I could do that.

"[PROSECUTOR]: You understand, in a very real sense, you would be doing that if you answer all three questions yes. The judge would have to do it then?

"[CONNER]: Yes, sir.

"[PROSECUTOR]: All right, I take it from what you are saying then that you have some religious, moral, or conscientious scruples against the imposition of the death penalty?

"[CONNER]: Well, as far as, to me, it is sort of like taking someone's life, or something like that.

"[PROSECUTOR]: That is what we are talking about. The death sentence reads that the defendant be taken and put in the electric chair and voltage passes through his body until he is dead. That is what we are talking about. I want you to understand it because from what we believe the facts will be, we have a duty to represent the people of the State of Texas, and we believe that the only just and proper punishment under what we think the evidence is going to show will be the death sentence. We are going to be asking the jury to answer those questions yes because we feel like we can prove they should be beyond a reasonable doubt, and we are going to be asking for the death penalty. Now, are your feelings about the death penal-

ty based upon religious, moral, conscience, all three?

"[CONNER]: I guess it is more conscience than anything.

"[PROSECUTOR]: All right. Are your feelings against the death penalty such that you feel you could never vote in such a way as to assess capital punishment?

"[CONNER]: Sir, to be honest with you, I really don't know. I think I would have to really think about it. To me it would be something hard to do.

"[PROSECUTOR]: Well, we understand it is not an easy thing. Do you understand that?

"[CONNER]: Yes, sir.

"[PROSECUTOR]: And I know that we put you on the spot, but we have got to know now.

"[CONNER]: Yes, sir.

"[PROSECUTOR]: When we don't mean, like to say, to put you on the spot, but this is the only chance we have to get an idea about how you feel about it, and if you couldn't answer those questions yes, even if that is what the evidence called for beyond a reasonable doubt, because the death sentence would result, if that is going to affect your deliberations on these fact questions, we have got to know this. The law says that unless you can state under oath, as you are now, that this mandatory death, or life imprisonment sentence would not influence you on a question of fact then you can't be qualified to sit on a capital punishment jury. There is no right or wrong answers about capital punishment. We know a lot of people feel one way or another. We wouldn't try to talk you out of your beliefs, or ask you to set them aside. If you feel that way we have got to know, and of course, you know, when this jury sits down here, we haven't done our job representing the people of this State unless we are sure how you feel about it.

"[CONNER]: Yes, sir. I would have to think about it, you know, I don't think I could just say, hey, I would probably say yes, I know, if I think he is guilty, I think yes, I would know he is guilty, but then as far as the murder part of it—

"[PROSECUTOR]: As far as the death penalty part?

"[CONNER]: Yes, sir. I don't think I will go that far.

"[PROSECUTOR]: Well, this is what it boils down to. If we prove to you that these questions should be answered yes beyond a reasonable doubt, and you know there is no question about it, it is absolute, and you know a yes answer will mean that this man over here will be sentenced to die in the electric chair.

"[CONNER]: I think it would bother me, sir.

"[PROSECUTOR]: All right, but could you answer them yes? And more directly, would you answer them yes even though you knew

As was with prospective juror Barton's voir dire examination, prospective juror Conner's examination also does not show that she was unambiguously against the imposition of capital punishment no matter what the trial might reveal or irrevocably committed, prior to trial, to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of the proceedings. *Witherspoon, supra.*

However, Conner did state that she would not be able to take an oath to the effect that the mandatory imposition of the death penalty or life imprisonment would not affect her deliberations on a question of fact. Thus, she would have been disqualified statutorily by V.T.C.A., Penal Code, Sec. 12.31(b). This section, entitled "Capital Felony," provides that:

"(a) An individual adjudged guilty of a capital felony shall be punished by confinement in the Texas Department of Corrections for life or by death.

"(b) Prospective jurors shall be informed that a sentence of life imprisonment or death is mandatory on conviction of a capital felony. A prospective juror shall be disqualified from serving as a juror unless he states under oath that the mandatory penalty of death or imprisonment for life will not affect his deliberations on any issue of fact."

We should concern ourselves then with the constitutional ramification of the disqualification of a prospective juror under the language of Section 12.31(b) when such juror has not been properly disqualified under *Witherspoon.*

In *Moore v. State*, 542 S.W.2d 664 (Tex. Cr.App.1976), we held that the inability to take the oath required by Section 12.31(b) renders the prospective juror disqualified and *Witherspoon* considerations are unnecessary.

However, *Witherspoon* holds that a juror's exclusion cannot be predicated upon his general objection to the death penalty or his conscientious and religious scruples against its infliction. It is readily apparent that a person who generally objects to the death penalty because of conscientious and religious scruples against its infliction will have his determination of fact affected by such belief. But if such "affectation" does not amount to an unambiguous and irrevocable commitment to vote against the death penalty in all cases, such individual cannot be constitutionally challenged for cause under *Witherspoon.*

Conversely, if a person is able to take the required oath and swear that his determination of fact will not be so affected, it follows that he is not unambiguously and irrevocably committed to vote against the death penalty in all cases.

*Witherspoon* allows that a person who could be constitutionally challenged for cause because of his irrevocable commitment to vote against the death penalty might nevertheless redeem himself, so to speak, by taking an oath such as the one provided for in Section 12.31(b):

"It is entirely possible, of course, that even a juror who believes that capital punishment should never be inflicted and who is irrevocably committed to its abolition could nonetheless subordinate his personal views to what he perceived to be his duty to abide by his oath as a juror and to obey the law of the State."
*Id.*, 391 U.S. at 514–515, n. 7, 88 S.Ct. at 1773.

However, *Witherspoon* also states that:
"The most that can be demanded of a venireman in this regard is that he be willing to *consider* all of the penalties provided by state law, and that he not be irrevocably committed, before the trial has begun, to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of the proceedings. If the *voir dire* testimony in a given case indicates that ve-

---

that or would you be inclined to answer no even though you felt the answer should be yes in order to avoid the death penalty?

"[CONNER]: I would have mixed emotions. I really don't know what I would do, for the simple reason that, well, I just fe*l*l like I would have to take his life, you*r* know."

niremen were excluded on any broader basis than this, the death sentence cannot be carried out even if applicable statutory or case law in the relevant jurisdiction would appear to support only a narrower ground of exclusion." (Emphasis included). *Id.*, at 522, n. 21, 88 S.Ct. at 1777.

From the face of the statute, one cannot say whether the "affectation" provided for in Section 12.31(b) is a "broader basis" than *Witherspoon*, or a "narrower ground of exclusion."

I would hold that the inability to take the oath required by Section 12.31(b), supra, does not mean that the juror is irrevocably committed to vote against the death penalty. However, the ability to take the oath shows that he is not so irrevocably committed. The oath merely provides one criterion by which a juror may be qualified. *See, Smith v. State*, 540 S.W.2d 693, 698 (Tex.Cr. App.1976).

To the extent that *Moore v. State, supra,* conflicts with this view, it should be overruled. *Witherspoon* considerations are always necessary. *Davis v. Georgia*, 429 U.S. 122, 97 S.Ct. 399, 50 L.Ed.2d 339 (1976).

I now turn to consideration of the fact that there was no objection to the sustaining of the challenge for cause made to prospective juror Barton and only an exception taken to the ruling on the one made to prospective juror Conner.

In *Boulware v. State*, 542 S.W.2d 677 (Tex.Cr.App.), *cert. denied*, 430 U.S. 959, 97 S.Ct. 1610, 51 L.Ed.2d 811 (1976),[3] we held that ". . . the failure to object to the improper exclusion of a venire member waives that right and it cannot be considered on appeal." *Id.*, at 683. We should reconsider that holding in light of the recent Supreme Court decision in *Davis v. Georgia, supra.*

In *Davis v. Georgia, supra*, the defendant contended that one prospective juror was excused in violation of *Witherspoon*. The defendant objected to the trial court's disqualification of this juror for cause. The Georgia Supreme Court affirmed the defendant's conviction. *Davis v. State*, 236 Ga. 804, 225 S.E.2d 241 (1976). The court stated that the defendant's objection, viz., "The fact that she is opposed to capital punishment would not disqualify her" was an insufficient objection. Nevertheless, the court considered the voir dire examination of the juror in light of *Witherspoon* standards. The court stated that the voir dire examination of the juror was inadequate under *Witherspoon* and that she was excused "without making it unmistakably clear that she would vote against the death penalty regardless of what transpires at trial . . . ." *Id.*, at 244. However, the Georgia Supreme Court refused to set aside the death penalty because "The rationale of *Witherspoon* and its progeny is not violated where merely *one* of a qualified class or group is excluded . . . ." (Emphasis included). *Id.*

Although the defendant's objection had been held to be an insufficient one, the Supreme Court of the United States summarily reversed the defendant's conviction without discussion of this matter. *Davis v. Georgia, supra.* The Court held that the Supreme Court of Georgia misinterpreted *Witherspoon* and did not apply

". . . the test that this Court has applied in subsequent cases where a death penalty was imposed after the improper exclusion of one member of the venire. (Citations). Unless a venireman is 'irrevocably committed, before a trial has begun, to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of the proceedings' (citation), he cannot be excluded; if a venireman is improper-

3. "Denial of certiorari, as has frequently been explained, imports nothing as to the merits of the case. All it means is that, for whatever reason, there were not four members of the Court who wished to hear the case." Wright, Law of Federal Courts, Sec. 108, at p. 551 (3rd ed. 1976), citing, *Hughes Tool Co. v. Trans*

*World Airlines*, 409 U.S. 363, 365, n. 1, 93 S.Ct. 647, 34 L.Ed.2d 577 (1973); *Brown v. Allen*, 344 U.S. 443, 489–497, 73 S.Ct. 397, 97 L.Ed. 469 (1953); *Maryland v. Baltimore Radio Show, Inc.*, 338 U.S. 912, 70 S.Ct. 252, 94 L.Ed. 562 (1950, Opinion of Frankfurter, J.).

ly excluded even though not so committed, any subsequently imposed death penalty cannot stand." *Id.*, 97 S.Ct. at 400.

In the case at bar, the two prospective jurors were excluded in violation of the *Witherspoon* standard. No objection was made when one was excused and only an exception taken when the other was excused. We should follow the mandate of the Supreme Court that "if a venireman is improperly excluded . . . any subsequently imposed death penalty cannot stand." *Id. Boulware v. State, supra,* should be overruled.

Because his jury was improperly selected, the appellant cannot constitutionally be put to death. "Whatever else might be said of capital punishment, it is at least clear that its imposition by a hanging jury cannot be squared with the Constitution." *Witherspoon, supra,* 391 U.S. at 523, 88 S.Ct. at 1778.

## II.

I further dissent to the majority's overruling of appellant's ground of error concerning his requested charge on circumstantial evidence as applied to the fact question posed by punishment issue No. 2.

As can be seen, the majority's opinion is bottomed on the following propositions:

(1) Punishment issue No. 2 inquires only into the probability of the defendant forming a future mens rea.

(2) Because punishment issue No. 2 inquires only into the defendant's future intent, the cases which hold that when intent is the only thing to be proven circumstantially, a circumstantial evidence charge is not required, further dictate that the proof of a probability of the defendant forming a future intent need not be accompanied by a circumstantial evidence charge.

(3) Because punishment issue No. 2 inquires into something not formerly asked of our juries, the traditional distinction between direct and circumstantial evidence fades and therefore dispenses with the necessity of a charge on circumstantial evidence.

"With the exception of Real Evidence, . . . all evidence . . . is classed as 'direct' or 'circumstantial' . . . ." 2 McCormick & Ray, *Texas Law of Evidence,* Sec. 1481, p. 328.

"There are three distinct methods of producing evidence for the purpose of persuading the trier of the facts as to the matters in issue. They are: (1) Direct testimony of witnesses as to the existence of the thing in issue. This may be termed Direct or Testimonial Evidence. (2) Evidence of some other fact not in issue from which may be inferred the existence of the fact in issue. This is Circumstantial or Indirect Evidence. (3) The presentation of the object itself for observation by the court and jury." 2 McCormick & Ray, *Texas Law of Evidence,* Sec. 1451, p. 296.

"We have three classes of evidence: (1) Direct or testimonial evidence; (2) indirect or circumstantial evidence; (3) autoptic preference, or real evidence." *Philadelphia & R. R. Co. v. Berg,* 274 F. 534, 537 (3rd Cir. 1921), *citing,* Greenleaf on Evidence (16th Ed.), Vol. 1, Sec. 13a; Wigmore on Evidence, Sec. 1150, et seq.

The State must prove each separate fact issue submitted at the punishment stage of the trial beyond a reasonable doubt. Article 37.071(c), V.A.C.C.P. An affirmative answer to punishment issue No. 2 must be supported by sufficient evidence. See our discussion of this contention in *Granviel v. State,* 552 S.W.2d 107 (Tex.Cr.App. delivered November 10, 1976); *Moore v. State,* 542 S.W.2d 664, 676 (Tex.Cr.App.1976); *Smith v. State,* 540 S.W.2d 693, 696 (Tex.Cr. App.1976, On Appellant's Motion for Rehearing), and the dissenting opinions in *Moore v. State, supra,* and *Livingston v. State,* 542 S.W.2d 655, 663 (Tex.Cr.App. 1976).

The State was only burdened to prove beyond a reasonable doubt that a probability was present, not that there was a present probability which would in fact ripen into a future actuality. The latter, I feel, would

be insusceptible of proof under the three classes of evidence known to the common law and above-mentioned. The State could not demonstrate or display a probability; it is an intangible concept; therefore there can be no real or demonstrative evidence of a probability. Consequently, unless we are to say that there is a new type of evidence, the determination of the fact question presented by punishment issue No. 2 can only be based on either direct or circumstantial evidence.

"[E]vidence is classed as 'direct' or 'circumstantial' according to the kind of inference which is sought to be drawn from it to the truth of the proposition for which it is offered. Thus, an inference from the assertion of a witness to the truth of the fact asserted is called direct evidence. On the other hand evidence offered for a proposition based upon some inference other than that from the mere assertion of a witness, is termed circumstantial evidence." McCormick & Ray, *supra*, at p. 328. Under this traditional distinction, it occurs to me that the two psychiatrists who testified in *Moore, supra*, that there was a probability that the defendant would commit criminal acts of violence presented direct, albeit opinion, evidence of that probability. In *Moore*, the psychiatrists examined the defendant and testified that as the result of their examination such probability was present. This testimony, although in the form of expert opinion, is no less direct than the layman's view of another and subsequent statement that what he saw was a person with brown eyes.

While I feel that psychiatric testimony is not sufficient in and of itself to support an affirmative answer to punishment issue No. 2, for the reasons stated in my dissenting opinions in *Moore, supra*, and *Livingston, supra*, I do feel that it takes the form of direct evidence.

In order to determine whether a circumstantial evidence charge should have accompanied punishment issue No. 2, we must examine the evidence upon which the jury based its answer to the fact question posed by punishment issue No. 2. Along with the evidence adduced at the guilt stage of the trial, the jury considered testimony of two police officers that appellant's reputation in the community for being a peaceful and law-abiding citizen was bad. The jury also considered the expert opinion evidence of a psychiatrist, Dr. Richard Gaines. He testified, in pertinent part, as follows:

"Q [BY PROSECUTOR] Dr. Gaines, let me ask you based upon your medical training and experience and examination of this defendant, John Charles Shippy, did you form an opinion based on those things as to the defendant's potential to commit criminal acts of violence? I am asking did you form an opinion as to whether or not—

"A Yes.

"Q —his potential to commit criminal acts of violence?

"[DEFENSE COUNSEL]: I object to that question as being improper. The question is not whether or not there is a potential. The question is whether or not there is a probability that he would.

"THE COURT: I overrule.

"Q Did you form such an opinion, Doctor?

"A Yes, sir.

"Q What is that opinion, please, sir?

"A This is with regard to a possibility?

"Q No, sir, right now I am asking you do you have an opinion as to whether or not he has a potential?

"A Yes.

"Q We are going to get into some other questions in a moment. What is your opinion?

"A That he does.

"Q Based upon these same criteria, that is, your medical training, background, and experience in the field of psychiatry and your examination of the defendant, John Charles Shippy, do you have an opinion as to whether or not he would be more or less likely to engage in acts of violence than the average person in society?

"A Yes.

"Q What is that opinion?

"A   Yes.

"Q   More or less, Doctor?

"A   More.

"Q   Doctor, let me ask you this question: Once again based upon the same criteria, do you have an opinion as to whether or not there would be a probability that the defendant would engage in criminal acts of violence in the future that would constitute a threat to other persons in society?

"A   I would have to ask for the definition of probability.

"Q   And that is something that we don't have a precise legal definition for, Doctor. We have said possibly one definition might be more likely than not or greater than a fifty fifty chance, but I will have to rely on you as far as what your interpretation of that term would be.

"A   I would have to say I think a possibility exists and as to probability I really find that a difficult question to answer.

"[PROSECUTOR]: We will pass the witness.

"Q   [BY DEFENSE COUNSEL] Dr. Gaines, can you state that there is a reasonable medical probability that the defendant would commit criminal acts of violence in the future that would constitute a continuing threat to society?

"A   No, I could not.

"[DEFENSE COUNSEL]: May I have a moment, Your Honor.

"Q   All right. Dr. Gaines, you stated in regard to a question from the State that there was a potential. My question is whether or not you equate potential with possibility, medical possibility, or are you equating that to a reasonable medical probability?

"A   No.

"Q   No, you are not?

"A   I am—

"Q   No, You are not equating it to a reasonable medical probability?

"A   I would not equate potential with possibility or probability.

"Q   All right. Isn't it true, Doctor, that under a given set of circumstances any person has a potential for violence?

"A   Yes.

"Q   Now, that would apply to . . . anyone, is that correct?

"A   Yes.

"Q   Then, Doctor, it is your testimony that you feel unequivocally that you cannot state there is a reasonable medical probability that the defendant would commit a criminal act of violence in the future that would constitute a continuing threat to society, is that correct?

"A   Yes.

"[DEFENSE COUNSEL]: Thank you. Pass the witness.

"Q   [BY PROSECUTOR] Doctor, I think—or something that we need to go into, what do you consider as meant by the term reasonable medical probability?

"A   I would assume that means better than a fifty-fifty chance.

"Q   Let me ask you this: [Defense Counsel] asked you if there was a possibility that anyone . . . would engage under certain circumstances in acts of violence. Earlier you stated that the defendant was more likely than the average person. How much more likely than the average person would be be engaged in such acts of violence?

*     *     *     *     *     *

"A   I would have to say in multiple, a number of times greater.

"Q   I am not trying to pin you down in numbers, but you are saying considerably greater? Would that be a fair statement?

"A   I would say significantly greater.

"[PROSECUTOR]: That's all we have, Your Honor.

"Q   [BY DEFENSE COUNSEL] Doctor, but when you state multiple or significantly greater you still say that you cannot state that there is a reasonable probability that he would commit

criminal acts of violence in the future that would constitute a continuing threat to society?

"A  That's right.

"Q  And you equate—and you state that reasonable medical probability would be greater than a fifty-fifty chance?

"A  Yes.

"Q  And you are stating therefore that there is not—you cannot state that there is a greater than a fifty-fifty chance that he would commit these criminal acts of violence in the future, is that correct?

"A  That's correct.

"Q  That it would be under that fifty-fifty chance?

"A  Yes.

"[DEFENSE COUNSEL]: Pass the witness.

"[PROSECUTOR]:  No further questions."

As can be seen, the psychiatrist in the instant case, unlike those in *Moore, supra,* would not testify that the "probability" was present.  From Dr. Gaines' testimony, from the facts of the primary offense, and from the testimony of the two police officers that appellant's reputation for being a peaceful and law-abiding citizen was bad, the jury was to determine whether the ultimate fact, the "probability," was present.

From this evidence, the jury could have logically inferred that there is a probability the appellant would commit criminal acts of violence that would constitute a continuing threat to society.  However, we have said many times that

"The distinction between circumstantial and direct evidence is that the latter applies directly to the ultimate fact to be proven, while circumstantial evidence is the direct proof of a minor fact which by logical inference demonstrates the fact to be proven." *McBride v. State,* 486 S.W.2d 318, 319 (Tex.Cr.App.1972).  *Accord, Eiland v. State,* 509 S.W.2d 596, 597 (Tex.Cr.App.1974); *Crawford v. State,* 502 S.W.2d 768, 769 (Tex.Cr.App.1973); *Selman v. State,* 505 S.W.2d 255, 257 (Tex.Cr.App.1974).

Since there was no direct evidence of the ultimate fact, that the "probability" was present, the jury could only have inferred the ultimate fact being present from the minor facts which were proven.  "In the absence of direct evidence, the refusal to grant a requested charge on circumstantial evidence is reversible error."  *Crawford, supra,* at 770.

The fact questions presented to the jury under Article 37.071, V.A.C.C.P., take place in the second half of a bifurcated trial.  At this stage of the proceedings, the State has the burden of proving beyond a reasonable doubt, by competent evidence, two or possibly three separate main facts.  In this sense, the State's task is no different from their proving the main facts at the first stage of the proceedings.  Indeed, it is the determination of the ultimate fact of whether the "probability" is present that determines the fate of the defendant and the fate of society.  When the proof of this separate ultimate fact depends solely upon circumstantial evidence, the jury should be instructed on the law of circumstantial evidence.

The question is whether to instruct the jury on the law of circumstantial evidence when the jury is determining ultimate facts at the punishment phase of the trial rather than at the guilt/innocence stage.  The majority states that the issue on which a circumstantial evidence charge was requested is "even further outside the scope of the established rule."  This only begs the question, since fact questions such as those contemplated by punishment issue No. 2 were simply not known to our jurisprudence while the rule was becoming so established.  Consequently, the rule is couched in language such as "the gravamen of the offense" and "the act of the crime."

The majority appears to be laboring under the assumption that punishment issue No. 2 only inquires into the probability of the defendant forming a futuristic intent.  I do not agree.  Punishment issue No. 2 inquires "whether there is a probability that the defendant *would commit* criminal

acts of violence that *would constitute* a continuing threat to society" (Emphasis added). Article 37.071(2), *supra*. Moreover, the United States Supreme Court has discussed our punishment issue No. 2 in terms of the prediction of *"future behavior,"* the prediction of "future criminal *conduct"* and the convicted person's "probable future *conduct."* (Emphasis added) *See Jurek v. Texas,* 428 U.S. 262, 274, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976).

The three traditional modes of proof apply, both at guilt and at punishment. There can be direct evidence of the "probability." The State must prove the ultimate fact of a "probability" beyond a reasonable doubt in the traditional evidentiary context. The cases dealing with intent do not apply.

The rule is that if the jury's verdict is to be based on circumstantial evidence, they should be instructed on the law of circumstantial evidence. The question is whether a different rule should apply when the verdict pertains to punishment instead of guilt. Under the new capital murder procedure, the State must prove certain separate elements beyond a reasonable doubt at punishment, just as they must prove the collective element of guilt. Indeed, we consider whether the "proof is evident" as to both the guilt-elements and the individual punishment-elements in determining whether one charged with capital murder can properly be denied bail. *Ex Parte Hammond,* 540 S.W.2d 328 (Tex.Cr.App.1976); *Ex Parte Wilson,* 527 S.W.2d 310 (Tex.Cr.App. 1975).

The majority appears to hold that because the rule has heretofore been applicable only when the main fact of guilt is to be determined circumstantially, when only one of the separate main facts of punishment is to be determined circumstantially, the letter of the rule does not allow it. This reasoning ignores the spirit of the rule:

"The rule of circumstantial evidence applies to all the facts in a case, and not to

any fact or set of facts . . . ." *Cox v. State,* 161 Tex.Cr.R. 421, 278 S.W.2d 155 (Tex.Cr.App.1955).

"Whenever the facts are circumstantial such charge is necessary, and to relieve the court from giving this charge the evidence must be positive. This rule, whenever the case is of a compound nature, applies both to the original case and to its derivatives . . . ." *Bloch v. State,* 81 Tex.Cr.R. 1, 193 S.W. 303, 305 (Tex.Cr.App.1917, On Appellant's Motion for Rehearing).

The question of whether a circumstantial evidence charge is required at the new capital murder punishment stage should not be dismissed with the reasoning that, so far, it has only been required at guilt. Generally speaking, we have never before asked the jury to determine separate facts at the punishment stage.[4] If the factum probandum of the offense depends on circumstantial evidence, such charge is necessary. *Bloch, supra.* The "probability" is part of the factum probandum[5] of capital murder. *Ex Parte Hammond, supra; Ex Parte Wilson, supra.* It is one of the separate main facts of punishment.

Because there was no direct evidence on one of the separate ultimate facts of punishment, the trial judge should have instructed the jury on the law of circumstantial evidence as applied to the fact question posed by punishment issue No. 2, as follows:

"An affirmative answer to question 2 will depend on circumstantial evidence. In order to warrant an affirmative answer based upon circumstantial evidence, each fact necessary to the conclusion sought to be established must be proved by competent evidence beyond a reasonable doubt; all the facts (that is, the facts necessary to the conclusion) must be consistent with each other and with the main fact sought to be proved, that is, the fact that there is a probability that the de-

---

4. *Cf., Brazile v. State,* 497 S.W.2d 302, 304 (Tex.Cr.App.1973).

5. "FACTUM PROBANDUM. Lat. In the law of evidence. The fact to be proved; a fact

which is in issue, and to which evidence is to be directed. 1 Greenl.Ev. § 13." Black's Law Dictionary, at p. 710.

fendant will commit criminal acts of violence that would constitute a continuing threat to society. The circumstances, taken together, must be of a conclusive nature, leading, on the whole, to a satisfactory conclusion and producing, in effect, a reasonable and moral certainty that there is a probability that the defendant will commit criminal acts of violence that would constitute a continuing threat to society. It is not sufficient that the circumstances coincide with, account for and therefore render possible a chance that the defendant would commit criminal acts of violence in the future that would constitute a continuing threat to society. The circumstances must exclude, to a moral certainty, every other reasonable hypotheses except that there is a probability the defendant would commit criminal acts of violence that would constitute a continuing threat to society. Unless they do so beyond a reasonable doubt, you will answer question No. 2 'No.' "

Because the trial court denied a timely request for a charge which would instruct the jury on the law of circumstantial evidence as applied to the fact question presented in punishment issue No. 2, I would reverse its judgment and remand the cause.

PHILLIPS, Judge, concurring in part and dissenting in part.

I concur in the disposition of appellant's ground of error pertaining to the submission of a charge on circumstantial evidence at the punishment phase of the trial for the following reasons.

"We have three classes of evidence: (1) Direct or testimonial evidence; (2) indirect or circumstantial evidence; (3) autoptic preference, or real evidence." *Philadelphia and R.R. Co. v. Berg,* 274 F. 534, 537 (3rd Cir. 1921), citing Greenleaf on Evidence (16th Ed.), Vol. 1, Sec. 13a; Wigmore on Evidence, Sec. 1150, et seq.

There being no expert testimony in the cause sub judice as to "future probability", the evidence on said issue is obviously entirely circumstantial.

The right to a charge on circumstantial evidence is not one of constitutional or legislative origin, but derives from the decisions of this Court. This Court has held such charge to be required only when the main fact of the offense, the factum probandum, is shown only by circumstantial evidence. *Bloch v. State,* 81 Tex.Cr.R. 1, 193 S.W. 303; *Hall v. State,* 161 Tex.Cr.R. 460, 278 S.W.2d 297; *Eiland v. State,* Tex. Cr.App., 509 S.W.2d 596. Such a charge has never been required solely because a fact issue as to a defendant's state of mind, e. g., intent or malice, is shown only through circumstantial evidence. *Davis v. State,* Tex.Cr.App., 516 S.W.2d 157; *Sloan v. State,* Tex.Cr.App., 515 S.W.2d 913; *Schwartz v. State,* 172 Tex.Cr.R. 326, 357 S.W.2d 393; *Wesley v. State,* 149 Tex.Cr.R. 650, 198 S.W.2d 103.

Such decisions, however, cannot be considered to apply to the present question for the reason that probability that an accused will conduct himself in a certain manner in the future is not necessarily determinable by the accused's past or present existing state of mind as is intent or malice at the time of the commission of a crime. What I consider to be controlling on the question are the following illuminating facts: (1) A charge on circumstantial evidence is by its very terms a general charge on the one ultimate, all encompassing issue of innocence or guilt of the offense alleged, McClung's Jury Charges for Texas Criminal Practice, page 173; (2) To single out one fact and charge upon it the law of circumstantial evidence is erroneous in that one fact is singled out as the main fact sought to be proved, *Montgomery v. State,* 157 Tex.Cr.R. 44, 246 S.W.2d 209; *Cox v. State,* 161 Tex.Cr.R. 421, 278 S.W.2d 155; and (3) Art. 37.071(c), V.A.C.C.P., specifically provides with regard to said fact issues therein that "the state must prove each issue submitted beyond a reasonable doubt."

Since a charge on circumstantial evidence has never been required except as a general charge on the one ultimate issue of innocence or guilt and since Art. 37.071, supra,

specifically provides the manner of submitting said issue to the jury with regard to the burden of proof required, I agree that a charge on circumstantial evidence was not required as to the issue submitted under Art. 37.071(b)(2), supra.

I dissent to the majority's disposition of appellant's jury selection complaint and concur with that part of Judge Roberts' dissenting opinion which states that the mandates of *Witherspoon v. Illinois*, supra, were violated when the trial court sustained the State's challenge for cause to veniremen Barton and Conner.